# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 10-60786-Civ-COOKE/BANDSTRA

COQUINA INVESTMENTS,

     Plaintiff,

vs.

SCOTT W. ROTHSTEIN and TD BANK, N.A.,

     Defendants.

_____/

## OMNIBUS ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

THIS MATTER is before me on Defendant TD Bank, N.A.'s Motion for Summary Judgment (ECF No. 225) and Plaintiff's Motion for Partial Summary Judgment (ECF No. 227). I have reviewed the parties' arguments, the record, and the relevant legal authorities. For the reasons explained in this Order, the Motions are granted in part and denied in part.

## I. BACKGROUND

The following facts are undisputed unless otherwise stated.[1]  Plaintiff Coquina Investments ("Coquina") brings this action against Defendant TD Bank, N.A. ("TD Bank") for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), conspiracy to commit RICO violations, fraudulent misrepresentation, and aiding and abetting fraud.[2]  Coquina is an investment partnership located in Corpus Christi, Texas. TD Bank is a large, national, commercial bank in United States.

---

[1] The facts set forth in the parties' respective Statements of Undisputed Facts are deemed admitted to the extent that they are supported by evidence in the record, and are not specifically disputed in an opposing statement of facts. S.D. Fla. L.R. 7.5(D); *see also Gossard v. JP Morgan Chase & Co.,* 612 F. Supp. 2d 1242, 1245-46 (S.D. Fla. 2009).

[2] Scott Rothstein is also a defendant in this case, but not subject to these motions for summary judgment.

A.     **Rothstein's Ponzi Scheme**

This case arises out of a complex Ponzi scheme[3] that Scott W. Rothstein, a now-disbarred attorney, orchestrated from 2005 to November 2009, as chairman and CEO of the now-defunct Florida law firm of Rothstein Rosenfeldt Adler, P.A. ("RRA").  RRA employed approximately seventy attorneys and specialized in various areas of law, including labor and employment law. As part of his Ponzi scheme, Rothstein offered to investors the opportunity to purchase structured settlements, which he claimed came from the settlement of lawsuits with high-profile defendants for large sums of money.  Rothstein and RRA held several bank accounts at TD Bank, which purportedly held settlement payments and investor funds.  Rothstein claimed that certain plaintiffs, who were RRA clients, wished to sell their interest in their structured settlements for an immediate lump sum payment.  The structured settlements, however, turned out to be fictitious.  Coquina alleges that it was an unwitting investor in this Ponzi scheme.

Rothstein counted on the help of at least two RRA employees to implement his scheme: Debra Villegas, Rothstein's paralegal, who later became RRA's Chief Operating Officer; and Curtis Renie, RRA's Director of Information Technology.  Mr. Rothstein also counted on the assistance of Stephen Caputi, a nightclub owner and Rothstein's friend.

Villegas pled guilty for her involvement in the Rothstein Ponzi scheme.[4]  As part of her

---

[3] The U.S. Securities and Exchange Commission defines a "Ponzi scheme" as follows:
> A Ponzi scheme is an investment fraud that involves the payment of purported returns to existing investors from funds contributed by new investors. Ponzi scheme organizers often solicit new investors by promising to invest funds in opportunities claimed to generate high returns with little or no risk. In many Ponzi schemes, the fraudsters focus on attracting new money to make promised payments to earlier-stage investors and to use for personal expenses, instead of engaging in any legitimate investment activity.

U.S. Secs. & Exch. Comm'n, *Ponzi Schemes – Frequently Asked Questions*, http://www.sec.gov/answers/ponzi.htm.

[4] This Court takes judicial notice of the docket and records in *United States v. Villegas*, Case No. 10-cr-60126-WJZ (S.D. Fla.).  As part of her guilty plea, Villegas signed, and later verified in open court, a

2

plea, Villegas admitted that she prepared fake settlement agreements that she and other co-conspirators provided to investors.  Villegas admitted that she and other co-conspirators established and maintained trust accounts to receive investor funds and to give investors the appearance of legitimacy and security.  Villegas admitted that she and other co-conspirators created false and fictitious bank balance statements along with purported "lock letters" (explained in further detail below) that stated that the funds in the trust accounts would be distributed only to specific investors.  Villegas also admitted that criminally derived proceeds from the Ponzi scheme were maintained at TD Bank, as well as other financial institutions, in order to convert the investors' money to the use and benefit of the co-conspirators.

Documents in evidence support Villegas's involvement in the scheme.  E-mails between Rothstein and Villegas show that Rothstein directed Villegas to create false TD Bank statements with account information that Rothstein provided to her.  (Foster Decl. ¶ 5a, Ex. 4, ECF No. 225-3).  Villegas complied, creating a letter purportedly signed by TD Bank Regional Vice President Frank Spinosa.  (Foster Decl. ¶ 5b, Ex. 5).

Numerous e-mail exchanges between Rothstein and Villegas also suggest that Villegas forged Spinosa's signature on several letters on TD Bank's letterhead, including a September 25, 2009 letter purportedly from Spinosa to Coquina verifying an account balance in the amount of $32 million.  (*See* Foster Decl. ¶¶ 5c,e, h, i; Exs. 6, 9, 14, 15).

Renie pled guilty for his participation in the Rothstein scheme by creating fake TD Bank websites and account balance sheets.[5]  As part of his plea, Renie admitted that, at Rothstein's

---

Statement of Facts.  (Case No. 10-cr-60126, ECF No. 20-3).  The facts set forth herein are taken from the signed Statement of Facts.

[5] This Court takes judicial notice of the docket and records in *United States v. Curtie*, Case No. 11-cr-60123-WPD (S.D. Fla.).  As part of his guilty plea, Renie signed, and later verified in open court, a Statement of Facts in which he admitted to creating a fake TD Bank website that Rothstein could access

request, he regularly made changes to a fake TD Bank website on Rothstein's office computer to make it appear to be the real TD Bank website. Renie admitted that, from early 2009 to October 2009, on at least seven occasions, Rothstein provided Renie and a co-conspirator with fake account statement information to be added to the fake TD Bank website. Renie admitted that he modified the account information shown on the fake website to include purported incoming and outgoing wire transfers and other information to falsely reflect that the TD Bank accounts held hundreds of millions of dollars. Renie further admitted that Rothstein brought at least three investors to the RRA office and accessed the fake TD Bank website for those investors, which falsely reflected that RRA held between $300 million and $1 billion on deposit at TD Bank.

The evidence on the record supports Renie's involvement in Rothstein's scheme. E-mail correspondence among Renie, Rothstein, and Villegas shows that Renie created updated balance sheets purporting to be on TD Bank's website and regularly updated the links to the fake TD Bank website on Rothstein's office computer, at Rothstein's request. (*See* Foster Decl. ¶¶ 5j-q, Exs. 16-23).

Caputi also pled guilty for his involvement in the Ponzi scheme.[6] As part of his plea, Caputi admitted that Rothstein would arrange to meet with investors at a TD Bank conference room, generally at the TD Bank branch in Weston, Florida. Caputi admitted that he would obtain from a co-conspirator a fraudulent bank statement that falsely showed that the investor's TD Bank trust account had a substantial amount of funds to pay off the investor in the future.

---

from his office computer at RRA. (Case No. 11-cr-60123, ECF No. 20). The facts set forth herein are taken from the signed Statement of Facts.

[6] This Court takes judicial notice of the docket and records in *United States v. Caputi*, Case No. 11-cr-60124-WJZ (S.D. Fla.). As part of his guilty plea, Caputi signed, and later verified in open court, a Statement of Facts in which he admitted that he posed as a TD Bank representative and as a purported plaintiff when he met with Rothstein investors. (Case No. 10-cr-60124, ECF No. 13-1). The facts set forth herein are taken from the signed Statement of Facts.

Caputi admitted that he would travel to TD Bank and wait in the conference room for the investor, and falsely introduce himself as a TD Bank customer service representative. Caputi admitted that he provided the investor with fraudulent bank statements. Caputi further admitted that he posed as a TD Bank banker on approximately three occasions. Additionally, Caputi admitted that on around September 25, 2009, he posed as a plaintiff for two potential investors and executed in front of them documents falsely claiming that he was entitled to settlement proceeds totaling $10 million dollars.[7]

The evidence supports Caputi's admission that Rothstein used conference rooms at TD Bank to meet with potential investors. TD Bank employees, including Spinosa, TD Bank Manager Rosanne Caretsky, and TD Bank Assistant Manager Jennifer Kerstetter were aware that Rothstein held meetings in TD Bank's conference room. However, according to Ketstetter, any TD Bank customer could use a TD Bank conference room if they so requested. (*See, e.g.*, Ketstetter Dep. 76:21-77:8). In preparation for such meetings, Caretsky and Ketstetter prepared a letter and other documents with account information, including balance statements, for each RRA/Rothstein account, but they did not personally hand the TD Bank documentation to investors. There is no *direct* evidence that Spinosa, Caretsky, or Ketstetter knew that Rothstein was running a Ponzi scheme or that Rothstein used the TD Bank conference room for nefarious purposes.

**B.     Coquina's Investments in Rothstein's Structured Settlements**

Coquina decided to invest in Rothstein's structured settlements after certain of its investors learned about the opportunity from Ira Sochet, a Florida-based investor who was also

---

[7] This appears to be a meeting where Coquina investors met with Rothstein and Caputi at the RRA offices, as described below.

investing with Rothstein.  (White Dep. 28:8-29:20; 33:9-23).  TD Bank did not introduce Coquina to Rothstein's investments.

Sochet placed Kathleen White, Coquina's managing partner and Rule 30(b)(6) corporate representative, in contact with Mike Szafranski, Sochet's friend and colleague, to learn more about the investment.  (*Id*.)  White testified that, after conducting some initial due diligence based on documents Szafranski provided to her, Coquina decided to use Szafranski's company, Alexa Funding, as a broker for the deal with Rothstein.  (White Dep. 38:8-46:19; 61:1-88:21; 98:3-105:21).

According to White, Szafranski told Coquina that he would review the executed settlement agreements and the TD Bank accounts.  (White Dep. 98:3-105:21).  Szafranski told White that he verified the relevant TD Bank accounts by going to Rothstein's office, where Rothstein accessed the TD Bank accounts from his office computer.  (*Id*.)  Szafranski also told White that he had access to an online account with an exchange company through which he could confirm the wire transfers Rothstein showed him.  (*Id*.)  At his deposition, Szafranski invoked his Fifth Amendment right in response to all substantive questions related to this supposed online account.

Coquina investor Mel Klein testified that he also conducted his own due diligence, which involved personal conversations with Sochet and making an assessment of TD Bank's structure. (Klein Dep. 77:17-25).  Additionally, on March 27, 2009, Klein met with Rothstein at his office in Fort Lauderdale.  (*Id*. at 46:23-47:25).  Rothstein answered general questions about the investment and the underlying settlements.  (*Id*. at 85:7-86:22).  Klein and Rothstein did not discuss any particular investment.  (*Id*. at 97:19-98:2).

On April 29, 2009, Coquina made its first investment with Rothstein.  (*See* Compl. ¶ 42).
From April 29, 2009, through September 29, 2009, Coquina made twelve wire transfers to TD
Bank and invested in a total of nineteen fictitious settlement agreements.  Rothstein allegedly set
up accounts at TD Bank for Coquina's investments.  Coquina claims that it invested over $37
million in the scheme.  (Compl. ¶ 42).

White testified that she met with Rothstein for the first time on July 7 or 8, 2009.  (White
Dep. 90:25-91:9).  By then, Coquina had already invested $6.7 million in fictitious settlement
agreements.  (*See* Compl. ¶ 42; White Dep. 121-122).  During the July 2009 trip, White and
Coquina investor Barrie Damson met with Rothstein and Szafranski.  (White Dep. 120:2-
122:25).

According to White, during the meeting with Rothstein, she did not handle any
documents; Rothstein only allowed her to view documents while seated next to him or looking
over his shoulder.  (White Dep. 127:19- 154:16).  Rothstein provided her with a letter on TD
Bank letterhead confirming an account statement, along with a TD Bank account statement.  (*Id*.)
Rothstein also showed her copies of wire transfers.  (*Id*.)  Additionally, Rothstein logged into
what he purported to be TD Bank's website and showed her the online account statements.  (*Id*.)
White asked whether Rothstein could segregate an account for Coquina's investment, and
Rothstein stated that he could do that, but noted that she would not be able to have online access
to the accounts.  (*Id*.) Damson, who is an attorney, was not in the room when Rothstein provided
TD Bank information to White or discussed the amount of money in the accounts. (*Id*.)

White testified that she did not speak with anyone at TD Bank before Coquina decided to
invest with Rothstein.  (White Dep. 91:10-23).

On August 17, 2009, Rothstein sent an e-mail to Spinosa[8] asking him to sign "lock letters" on TD Bank letterhead to investors, including Coquina.  "Lock letters" were letters to investors, which stated that all funds in the specified account could only be distributed to that particular investor.  (Spinosa Dep. 22:3-25:1, Ex. 2).  The evidence presented suggests that TD Bank could not restrict an account in the way described in the "lock letters."  (*See, e.g.*, Ketstetter Dep. 129:5-14; Caretsky 2004 Exam. 205:15- 211:25).[9]  Wendy Litterio, Spinosa's administrative assistant, recalls preparing approximately five "lock letters" for Spinosa on TD Bank letterhead.  (Litterio Dep. 92:10-101:13).  Litterio testified that Rothstein would send Spinosa an e-mail with the contents of the letter, which she would cut and paste onto TD Bank letterhead for his signature.  (*Id.*)  Caretsky testified that she saw some of the lock letters to investors, which Spinosa e-mailed to her.  (Caretsky Dep. 121:25-123:24).  Spinosa instructed her to place a note on the accounts subject to "lock letters" stating that "if anybody contacts anyone regarding this account, please call Rosanne [Caretsky] or Frank [Spinosa]."  (Caretsky Dep. 121:25-123:24).

---

[8] Coquina relies heavily on Spinosa's invocation of his Fifth Amendment right in response to substantive questions posed in his deposition to draw conclusions about what he knew regarding Rothstein's scheme. A court may draw adverse inferences against a party based on a witness's invocation of Fifth Amendment.  *Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 674-75 (5th Cir. 1999); *Arango v. U.S. Dep't of the Treasury*, 115 F.3d 922, 926 (11th Cir. 1997).  However, a court may not grant summary judgment based on solely on an adverse inference; instead, a court must weigh it with other evidence to determine whether genuine issues of fact exist.  *SEC v. Monterosso*, 746 F. Supp. 2d 1253, 1261-62 (S.D. Fla. 2010).  Additionally, an adverse inference alone is insufficient to create an issue of fact to avoid summary judgment.  *Curtis*, 174 F.3d at 675.  I will consider Spinosa's deposition along with the other evidence presented in this case.

[9] TD Bank objects to Coquina's use of examinations taken pursuant to Rule 2004 of the Federal Rules of Bankruptcy in *In re Rothstein Rosenfeld Adler, P.A*., No. 09-34781 (Bankr. S.D. Fla.), as evidence in this action.  Indeed, some courts have held that, because Rule 2004 examinations are not depositions, the witness's testimony cannot be admitted as evidence for purposes of summary judgment.  *See, e.g.*, *In re Oliver*, 414 B.R. 361, 370 (Bankr. E.D. Tenn. 2009).  However, a Rule 2004 examination satisfies the requirements for an affidavit under Rule 56(c) of the Federal Rules of Civil Procedure.  *See In re Leonard*, 418 B.R. 477, 484 n.2 (Bankr. S.D. Fla. 2009).  Therefore, I will consider the transcripts of 2004 examinations as affidavits at this stage of the proceedings.  The transcripts of such examinations shall be cited herein as, "[Last name] 2004 Exam. [pin-cite]."

Also on August 17, 2009, Rothstein sent Coquina a "lock letter" on RRA letterhead, which stated, "[t]his letter is not meant to convey any ownership of the account or access to the account to any other party but rather is meant to irrevocably restrict conveyances from this account to Coquina Investments." (Spinosa Dep. 41:23-44:5, Ex. 3; White Dep. 203:8-17). An acknowledgment appears at the bottom of the letter, which contains Spinosa's purported signature and his TD Bank title. (*Id*.) By the time Coquina received its first "lock letter," it had made eight wire transfers to TD Bank in the amount of $13,700,000. (*See* Compl. ¶ 42).

That same day, Rothstein sent Spinosa an e-mail regarding a conference call with Coquina. (Mandel Decl. ¶ 3, Ex. A). Mr. Rothstein stated that he would ask Spinosa whether TD Bank had placed an "irrevocable restriction" on Coquina's account. (*Id*.) Rothstein told Spinosa to "just answer yes to all the questions and we are done." (*Id*.) Spinosa agreed. (*Id*.)

Klein and Damson, who attended an August 17, 2009 conference call with Rothstein and a person purporting to be Spinosa, testified that Spinosa confirmed that Coquina's account was segregated and that it contained $22 million. (Klein Dep. 72:7-73:8; Damson Dep. 154:2-157:21). This telephone call was the first verbal communication that anyone from Coquina ever had with TD Bank. (White Dep. 215:9-16). Following this telephone call, Coquina continued to make investments with Rothstein. (Compl. ¶ 42).

On September 19, 2009, Spinosa purportedly signed another "lock letter" to Coquina, this time on TD Bank letterhead. (Spinosa Dep. 59:11-60:12, Ex. 12).

According to White, on September 25, 2009, she and Damson met with Rothstein at RRA's office in Florida. (White Dep. 221:14-241:1). Upon their arrival, Mr. Rothstein stated that he had arranged for the investors to witness a client signing settlement papers. (*Id*.) The fake client, Stephen Caputi, purportedly received a $10 million settlement, but agreed to take $5

million in a lump sum payment.  (*Id.*)  Rothstein explained that he would not take an attorney's fee for this case.  (*Id.*)  Although White served as a witness to the execution of the agreement and was investing in it, she did not review the materials, which apparently contained errors and discrepancies.  (*Id.*)  Damson, an attorney, did not question the documentation.  (*Id.*)  Before transferring the money to invest in this deal, White received confirmation from Damson that the deal looked good.  (*Id.*)  After Caputi left, Damson told White, "I'm a lawyer.  That was – that's exactly how that goes.  I feel great about this."  (White Dep. 246:23-247:2).

After the meeting with Caputi, Rothstein took White and Damson to TD Bank's office, where they met a person who introduced himself as Frank Spinosa.  (White Dep. 247:12-253:18; Damson Dep. 221:2-25; 228:8-17).  Spinosa explained that the irrevocable restriction on the trust account was not unusual, TD Bank held other accounts with the same restriction, and the bank had systems in place to ensure compliance.  (*Id.*)  Spinosa also confirmed that the account held over $22 million.  (*Id.*)

On September 29, 2009, Coquina made another $5 million investment with Rothstein.  (White Dep. 258:25-259:5; Compl. ¶ 42).  This was Coquina's last investment with Rothstein.  (Compl. ¶ 42).

Sometime at the end of September 2009, Coquina failed to receive a scheduled payment on one of its investments.  (White Dep. 267:18-269:6).  On September 29, 2009, Coquina received a letter on TD Bank letterhead, containing Spinosa's purported signature, apologizing for problems with the bank's internet banking system.  (Foster Decl. ¶ 5e, Ex. 9).  Eventually Coquina received the late payment.  (White Dep. 267:18-269:17).  Sometime in October 2009, Rothstein failed to make another timely payment, which Coquina eventually received a few weeks later.  (*Id.*)

Shortly thereafter, Rothstein fled to Morocco.  The government filed charges against him on December 1, 2009.  On January 27, 2010, Rothstein pled guilty to conspiracy to commit RICO violations, conspiracy to commit money laundering, conspiracy to commit mail and wire fraud, and two counts of wire fraud.  *See United States v. Rothstein*, Case No. 09-cr-60331 (S.D. Fla.).  On June 9, 2010, he was sentenced to 50 years imprisonment.

## C.     TD Bank's Account Management

The TD Bank branch in Weston, Florida, managed at least three RRA/Rothstein accounts. TD Bank Regional Vice President Frank Spinosa was the main person who handled the RRA/Rothstein accounts in the Weston and Fort Lauderdale TD Bank branches.  Mr. Spinosa held this position from 2006 until TD Bank terminated him on November 1, 2009.  Additionally, it appears from e-mails, affidavits, and other evidence that Manager Rosanne Caretsky, Assistant Manager Jennifer Kerstetter, and Cash Management Representative Paolo Casabone were also involved in the management of the RRA/Rothstein accounts.

According to TD Bank's corporate representative, Senior Vice President Carlo A. DiToro, from December 18, 2008, through October 29, 2009, TD Bank generated twenty-one fraud alerts in connection with the RRA/Rothstein accounts.  DiToro Decl. ¶ 6.  DiToro averred that on at least one occasion, TD Bank placed a hold on an RRA/Rothstein account.  *Id.*  In September 2009, TD Bank changed its anti-money laundering system.  According to TD Bank's corporate representative Vincent Auletta, from September 2009 through October 2009, TD Bank generated at least one or two, but not more than five, fraud alerts on RRA/Rothstein accounts. (Auletta Dep. 267:9-270:22).  Auletta testified that when the system generates an alert, the TD Bank protocol is to investigate the account within ten to fourteen days.  (*Id.*)  In the last week of

October 2009, an RRA account went into overdraft status twice in a period of one to three days, which Caretsky found "unusual."  (Caretsky 2004 Exam. 231:4-17).

## II. LEGAL STANDARDS

A court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Rule 56's plain language "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U .S. 317, 322 (1986).

"The moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).  Rule 56 "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial."  *Celotex*, 477 U.S. at 324.  Thus, the nonmoving party "may not rest upon the mere allegations or denials of his pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).

### III. ANALYSIS

**A.   Count 1:  RICO Violation Through Conduct of an Enterprise, 18 U.S.C. § 1962(c)**

Section 1962(c) of the RICO Act makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c).  "[T]o establish a federal civil RICO violation under § 1962(c), the plaintiffs must satisfy four elements of proof: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1291-92 (11th Cir. 2010).  Additionally, the plaintiff must prove injury to its business or property and must show that the defendants' substantive RICO violations caused its injuries.  *Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1282-83 (11th Cir. 2006) (citing 18 U.S.C. § 1964(c)).

An "enterprise" may be "any union or group of individuals associated in fact."  18 U.S.C. § 1961(4); *see also United States v. Goldin Indus., Inc.*, 219 F.3d 1271, 1275 (11th Cir. 2000) ("[T]he existence of an enterprise 'is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit' . . . that furnishes a vehicle for the commission of two more predicate crimes") (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)).  Racketeering activity includes any act which is indictable under 18 U.S.C. § 1343 (relating to wire fraud), 18 U.S.C. § 1956 (relating to the laundering of monetary instruments), or 18 U.S.C. §§ 2314 and 2315 (relating to interstate transportation of stolen property).  18 U.S.C. § 1961(1).  A "pattern of racketeering activity" is shown when an enterprise commits at least two distinct but related racketeering acts (referred to as predicate acts).  *Edwards*, 602 F.3d at 1292.

A court should grant summary judgment when there is "a complete failure of proof concerning an essential element of the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (11th Cir. 1986).   Because there is insufficient evidence to establish that TD Bank conducted or participated in the conduct of an enterprise, or engaged in a pattern of racketeering activity, summary judgment is granted in favor of TD Bank.

### 1.  *TD Bank Did not Conduct or Participate in the Conduct of an Enterprise*

A plaintiff must establish that the defendants participated in the operation or management of the enterprise.   In order to "'participate, directly or indirectly, in the conduct of such enterprise's affairs,' one must have some part in directing those affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993).  This requirement does not mean that RICO liability is limited to those with primary responsibility for the enterprise's affairs or those with a formal position in the enterprise.  *Id.*  It is sufficient for a plaintiff to show that the defendant exercised some degree of direction and control of the enterprise.  *Id*. at 179, 194.  Further, RICO liability "depends on showing that the defendants conducted or participated in the conduct of the '*enterprise's* affairs,' not just their *own* affairs."  *Id.* at 185.

*Reves* concerned the liability of outsiders who assist the enterprise's affairs.  The *Reves* Court, however, recognized that upper management, as well as lower rung participants who are under the direction of upper management, may operate an enterprise.  *Id*. at 184.  The Court declined to decide how far RICO liability may extend down the ladder of an enterprise's operation.  *Id*. at 184 n.9.  Reaching this question, the Eleventh Circuit has held that lower-rung participants acting under the direction of the enterprise's upper management may be liable under § 1962(c) by "knowingly implementing decisions, as well as by making them."  *United States v. Starrett*, 55 F.3d 1525, 1548 (11th Cir. 1995) (quoting *United States v. Otero*, 37 F.3d 739, 750

(1st Cir. 1994)); *see also Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards,* 437 F.3d 1145, 1156 (11th Cir. 2006) (quoting *Starrett,* 55 F.3d at 1548).

In arguing that TD Bank meets the "conduct" requirement, Coquina's imputes to TD Bank the purported actions of its former Regional Vice President Frank Spinosa, as well as other employees. The initial question before this Court is whether TD Bank may, as a matter of law, be vicariously liable under § 1962(c) for its employees' acts. TD Bank argues that it cannot be vicariously liable for its employees' actions because it was merely an unwilling conduit for the predicate crimes. Coquina does not address these arguments in its Response to TD Bank's Motion.

Most circuits have held that vicarious liability is inappropriate where the corporate defendant is the RICO enterprise because imposing liability in such circumstances would violate the non-identity rule, i.e., under § 1962(c) a RICO defendant cannot be the same entity as the RICO enterprise. *See, e.g.*, *Cox v. Admin'r U.S. Steel & Carnegie,* 17 F.3d 1386, 1404-06 (11th Cir. 1994) (discussing approaches in various circuits). Here, Coquina alleges that the enterprise consists of an association-in-fact between Rothstein and TD Bank. Thus, TD Bank does not make up the entire enterprise. Imposing vicarious liability on TD Bank would not violate the non-identity rule.

The Eleventh Circuit has suggested that vicarious liability may apply when the non-identity rule is not violated. *See Cox,* 17 F.3d at 1406.[10] To determine whether a plaintiff has

---

[10] When the Eleventh Circuit issued the *Cox* decision, the law of this circuit was that a RICO defendant and a RICO enterprise could be the same. In 2000, the Court of Appeals, sitting *en banc*, reversed course to conform to the other circuits on this issue, holding that "[t]he distinction between the RICO person and the RICO enterprise is necessary because the enterprise itself can be a passive instrument or victim of the racketeering activity." *Goldin Indus.*, 219 F.3d at 1270. In *Cox*, the court noted in *dicta*, however, that even if it adopted the non-identity rule, it would still impose vicarious liability on the defendant Union because to do so would not violate the non-identity rule. 17 F.3d at 1406.

established a prima facie case of vicarious liability, a court applies the following "general agency principles":

> Under general agency rules, a corporation (principal) will be vicariously responsible for the wrongful acts of its employees (agents) when the acts are: (1) related to and committed within the course of employment; (2) committed in furtherance [of the business] of the corporation; and (3) authorized or subsequently acquiesced in by the corporation.

*Id*. at 1406-07 (quoting *Quick v. Peoples Bank of Cullman Cnty.,* 993 F.2d 793, 797 (11th Cir. 1993)).   A court must also consider whether the defendant derived some benefit from its employees' RICO violations.  *See Cox*, 17 F.3d at 1408; *see also Brady v. Dairy Fresh Prods. Co.,* 974 F.2d 1149, 1154 (9th Cir. 1992) ("We hold that an employer that is benefited by its employee or agent's violations of section 1962(c) may be held liable under the doctrines of respondeat superior and agency when the employer is distinct from the enterprise.").

Coquina fails to provide evidence to show that TD Bank derived some benefit from Spinosa's or any other employee's alleged RICO violations.  The Eleventh Circuit provides some guidance on this question in *Quick* and *Cox*.   *Quick* concerned a bank loan officer (who later became a vice president at the bank) who failed to credit the plaintiffs' deposits and loan payments to their account.  The court held that the bank had benefited from the wrongful acts of its loan officer because the presence of additional debt owed on the plaintiff's loan resulted in additional earned interest for the bank.  The court held that the bank accepted these ill-gotten benefits when, in an effort to cover up the misconduct, it requested plaintiffs to sign a consolidation note including the loans.  *Quick*, 993 F.2d at 798.  In *Cox*, the court found that a Union could be vicariously liable for the acts of two of its negotiators, who secured pensions for themselves and a few others in exchange for granting certain concessions to a steel mill.  The court pointed to the Union president's testimony to the effect that the Union benefits when its

representatives receive pension benefits because it makes Union representation more attractive and makes it easier for the Union to recruit workers to serve as representatives. *Cox*, 17 F.3d at 1408.

Coquina has presented evidence that a large amount of money passed through the RRA/Rothstein accounts, and the employees at TD Bank's Weston branch considered Rothstein their biggest client. Coquina, however, presents no evidence or arguments to show that the transfers or open accounts somehow benefited TD Bank. Coquina does state that "TD Bank opened numerous operating and trust accounts on behalf of Rothstein and RRA and allowed them to stay open despite fraud alerts, overdrafts, uncollected funds, high dollar amount transfers and low monthly balances." (Pl.'s Opp. 6). From these facts alone, however, I cannot infer that TD Bank derived some benefit from the RICO violations, such as in the form of high monthly balances that would improve the bank's cash or result in interest earnings. *Cf. Davis v. Mutual Life Ins. Co. of New York*, 6 F.3d 367, 379-80 (6th Cir. 1993) (life insurance company could be vicariously liable for employee's fraudulent sales of policies because it benefited from a resultant increase in its corporate income); *Schuster v. Anderson*, 378 F. Supp. 2d 1070, 1105 (N.D. Iowa 2005) (finding vicarious liability viable where plaintiff sufficiently alleged that bank benefited by receiving nearly half a million in interest from fraudulent loans). The facts Coquina states actually demonstrate that TD Bank suffered because it was owed "uncollected funds" and the Rothsten/RRA accounts had "low monthly balances." In the absence of any evidence showing that TD Bank derived some benefit from Spinosa's or any other employee's alleged wrongdoing, vicarious liability cannot apply as a matter of law.

Absent vicarious liability, through which its employees' actions would be imputed to TD Bank, there is no evidence that TD Bank directed the affairs of the enterprise or knowingly implemented or made decisions as a lower-rung participant.

Even assuming Coquina could impute Spinosa's or other employees' actions to TD Bank, however, its RICO claim would still fail.   First, there is no evidence that Spinosa or other employees directed the affairs of the enterprise.   Even viewed in the light most favorable to Coquina, the facts show that Rothstein was the person responsible for directing and managing the Ponzi scheme.  The evidence shows that Rothstein directed his associates, Villegas, Renie, and Caputi, among others, to forge TD Bank documents, create fake TD Bank websites, and pose as TD Bank bankers and as plaintiffs.  The evidence shows that Rothstein told Spinosa what to say during a conference call with Coquina investors.  The evidence also shows that Rothstein provided Spinosa with a draft "lock letter" and directed him to place it on TD Bank letterhead and sign it.  In short, there is no evidence whatsoever that TD Bank, through Spinosa or any other employee, directed the enterprise's affairs.[11]

There is also insufficient evidence to support a "lower-rung participant" theory.  In *MCM Partners, Inc. v. Andrews-Bartlett & Associates, Inc*., the Seventh Circuit analyzed whether the plaintiff sufficiently alleged that two contractors were lower-rung participants in an enterprise. 62 F.3d 967 (7th Cir. 1995).  In arriving at its decision that the two defendant contactors could be liable as lower-rung participants, the court found the following allegations were relevant:  (i) the defendants were members of the association-in-fact constituting the enterprise; therefore, under

---

[11] At most, the evidence may support a finding that TD Bank assisted in the enterprise.  However, aiding and abetting is insufficient to establish the requisite level of participation for a RICO violation.  *See Reves*, 507 U.S. at 178-79 (rejecting argument that "participate" is a synonym for "aid and abet," noting: "That would be a term of breadth indeed, for 'aid and abet' 'comprehends all assistance rendered by words, acts, encouragement, support, or presence.'  Black's Law Dictionary 68 (6th ed. 1990).  But within the context of § 1962(c), 'participate' appears to have a narrower meaning.").

the plaintiff's theory of the case, they were part of the enterprise itself; (ii) the defendants knowingly undertook the predicate acts at the direction of the enterprises' management; (iii) the defendants were "vital to the achievement of the enterprise's primary goal." *Id*. at 978-79.

Although there is some evidence to infer that TD Bank, through Spinosa or other employees, may have knowingly undertook the predication acts,[12] there is no evidence that TD Bank, through Spinosa or other employees, was vital to the achievement of the enterprise's primary goal of generating money.

In *MCM Partners*, the Seventh Circuit held that the plaintiff, a rental equipment company, alleged sufficient facts to show certain exhibition contractors (alleged members of the association-in fact) were vital because only they had the ability to exclude the plaintiff from the market by dealing exclusively with another rental equipment company.  62 F.3d at 979.  Coquina argues that "only TD Bank could offer the fiction of the restricted account, the persuasiveness of contemporaneous account statements and other indicia of the security of the funds, all while cloaked with the illusion of integrity vested upon banks by virtue of their regulation by the federal government."  (Pl.'s Opp. 9).  However, Coquina fails to point to any evidence to suggest that "only TD Bank" could do this.  The evidence shows that TD Bank was not vital at all. Rothstein could have used any bank to conduct the money transfers.  In fact, Rothstein maintained accounts at other banks.  *See* Plea Agreement and Statement of Facts, at 11, *United States v. Rothstein*, Case No. 09-cr-60331 (S.D. Fla. Jan. 27, 2010) ("Defendant Rothstein and other co-conspirators established and maintained trust accounts at several financial institutions in order to receive the investor funds and to give the appearance of legitimacy and security.");

---

[12] However, I also note that the evidence suggests that Spinosa tried to conceal information from other TD Bank employees.  For example, he instructed Caretsky to place a note on the accounts subject to "lock letters" stating that if anybody contacted TD Bank about the account, the TD Bank employee should contact Spinosa or Caretsky.

Statement of Facts, at 4, *United States v. Villegas*, Case No. 10-cr-60126-WJZ (S.D. Fla. Jun. 11, 2010) ("Co-conspirators established and maintained trust accounts at several financial institutions in order to receive the investor funds and to give the appearance of legitimacy and security.").  Moreover, the evidence shows that, to operate his Ponzi scheme, Rothstein directed others to create fake TD Bank account statements, TD Bank websites, and TD Bank correspondence, and pose as TD Bank bankers.  The evidence demonstrates that the TD Bank's participation was not vital.

## 2.  *Pattern of Racketeering Activity*

Even assuming Coquina could establish the RICO "conduct" requirement, Coquina's claim fails because the evidence is insufficient to establish a pattern of racketeering activity under the legal theory advanced in its Complaint.

"[A] plaintiff in a RICO action must allege either an 'open-ended' pattern of racketeering activity (i.e., past criminal conduct coupled with a threat of future criminal conduct) or a 'closed-ended' pattern of racketeering activity (i.e., past criminal conduct 'extending over a substantial period of time')."  *GICC Capital Corp. v. Tech. Fin. Grp., Inc.,* 67 F.3d 463, 466 (2d Cir. 1995).  Coquina acknowledges that it has "primarily relied upon a closed-ended continuity theory," but now seeks to rely on a new legal theory for recovery based on open-ended continuity.  (Pl.'s Opp. 14).  Coquina specifically pled in its Complaint that "Defendants engaged in a pattern of related and continuous predicate acts over a substantial, but closed, period of time."  (Compl. ¶ 66).[13]  The Rule 8 pleading requirements exist to "give the defendant fair notice of what the claim is and the grounds upon which it rests."  *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 974 (11th Cir. 2008).

---

[13] Coquina's Civil RICO Statement similarly fails to put TD Bank on notice of this legal theory.  See Civil Rico Statement, ECF No. 16, p. 17).

Now, in response to summary judgment, Coquina argues that it meets both the closed-ended and open-ended continuity tests.  Each legal theory requires different elements of proof, and therefore requires proof of different facts.  "A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time." *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1265 (11th Cir. 2004).  In contrast, open-ended continuity "rel[ies] on alleging the *threat* of continuity."  *Id*. Under that theory, a plaintiff meets its burden "by establishing either that the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future, or that the predicate acts or offenses are part of an ongoing entity's regular way of doing business."  *Id*.

Coquina's Complaint did not place TD Bank on notice that it would pursue the open-ended continuity legal theory.  In fact, Coquina clearly pled that its claim was based on closed-ended continuity.  Coquina is not merely asserting additional facts in support of its claim as pled; rather, it is asserting an additional, separate basis for establishing a pattern of activity, which requires different elements of proof.  Having placed TD Bank on notice that it would pursue only a closed-ended theory of continuity, Coquina cannot now change course and "amend [its] complaint through argument in a brief opposing summary judgment."  *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004); *see also Hurlbert v. St. Mary's Health Care Sys., Inc*., 439 F.3d 1286, 1297 (11th Cir. 2006); *Coleman v. Quaker Oats Co*., 232 F.3d 1271, 1292 (9th Cir. 2000).

Having determined that Coquina cannot pursue an open-ended continuity theory at this stage of litigation without amending its Complaint, I will address whether Coquina establishes a pattern of racketeering activity under the closed-ended continuity test.  As noted above, "[a] party alleging a RICO violation may demonstrate continuity over a closed period by proving a

series of related predicates extending over a substantial period of time." *Jackson*, 372 F.3d at 1265.

Coquina alleges that the enterprise's predicate acts occurred from April 29, 2009, to September 29, 2009.  (Compl. ¶¶ 39-51).  Coquina argues, however, that the beginning of the relevant period for determining a pattern of racketeering activity should be 2005, when Rothstein began defrauding investors, or 2007, when Coquina contends TD Bank became involved in Rothstein's overall scheme.  The relevant period under the closed-ended test "is the time during which RICO predicate activity occurred, not the time during which the underlying scheme operated or the underlying dispute took place." *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 184 (2d Cir. 2008); *see also Feinstein v. Resolution Trust Corp.*, 942 F.2d 34, 46 (1st Cir. 1991) ("We hold that, in assessing the longevity of a RICO scheme involving allegations of mail fraud, the scheme's duration must be measured by reference to the particular defendant's fraudulent activity . . ..").  Thus, the relevant period is April 29, 2009, to September 29, 2009.

Continuity is "centrally a temporal concept." *Cox*, 17 F.3d at 1397 (quoting *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 241-42 (1989)).  While the Eleventh Circuit has not established a bright-line rule stating the minimum time period necessary to establish a pattern of activity under the closed-ended analysis, it has noted that "the great weight of authority suggests that nine months is a wholly insufficient interlude." *Jackson*, 372 F.3d at 1266.  In this case, Coquina establishes a pattern of activity over a five-month period.  Although the alleged racketeering activity in this case involved multiple fictitious settlements and wire transfers, the Eleventh Circuit has noted that "the *substantial* period of time requirement for establishing closed-ended continuity cannot be met with allegations of schemes lasting less than a year." *Id.*

The alleged scheme therefore developed in too short a period of time to qualify as a pattern of racketeering activity under the closed-ended test.

**B.**     **Count 2:  Conspiracy to Violate RICO, 18 U.S.C. § 1962(d)**

"Section 1962(d) of the RICO statutes makes it illegal for anyone to conspire to violate one of the substantive provisions of RICO, including § 1962(c)."  *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1293 (11th Cir. 2010).  "A plaintiff can establish a RICO conspiracy claim in one of two ways: (1) by showing that the defendant agreed to the overall objective of the conspiracy; or (2) by showing that the defendant agreed to commit two predicate acts."  *Republic of Pan. v. BCCI Holdings (Lux.) S.A.*, 119 F.3d 935, 950 (11th Cir. 1997).  "To prove a conspiracy to violate § 1962(c), a plaintiff must demonstrate that a defendant objectively manifested, through words or actions, an agreement to participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity."  *Liquidation Comm'n of Banco Intercontinental, S.A. v. Renta*, 530 F.3d 1339, 1353 (11th Cir. 2008) (internal quotation marks omitted).  "The existence of an agreement, as well as its objective, may be inferred from circumstantial evidence demonstrating that each defendant must necessarily have known that the others were also conspiring to participate in the same enterprise through a pattern of racketeering activity."  *Id.* (internal quotation marks omitted).

TD Bank contends that there is no evidence that Rothstein and TD Bank conspired to commit RICO violations.  Coquina presents no evidence of a conspiracy, but merely argues that because it has presented sufficient facts supporting its § 1962(c) claim, its conspiracy claim should go to a jury.  There appears to be no evidence to support the existence of an agreement between TD Bank and Coquina to participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity.  This claim therefore fails.

C.      **Count 3:  Fraudulent Misrepresentation**

To state a cause of action for fraudulent misrepresentation, a plaintiff must prove:  "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and, (4) consequent injury by the party acting in reliance on the representation."  *Johnson v. Davis*, 480 So. 2d 625, 627 (Fla. 1985).  "An employer is responsible for an intentional tort committed by an employee if the employee committed the tort while acting within the course and scope of his employment, with the purpose of benefiting the interests of the employer."  *Strickland v. Jacobs*, 66 So. 3d 412, 414 (Fla. Dist. Ct. App. 2011) (quoting *Ruiz v. Aerorep Grp. Corp.,* 941 So. 2d 505, 507 (Fla. Dist. Ct. App. 2006)).

There are issues of fact with respect to agency, and, by extension, to vicarious liability. *See generally Citibank, N.A. v. Data Lease Fin. Corp.,* 828 F.2d 686, 691 (11th Cir. 1987) ("It is well settled under Florida law that, the existence of an agency relationship, the nature and extent of the agent's authority, and the inclusion within the scope of that authority of a particular act are ordinarily questions to be determined by the jury or by the trier of facts in accordance with the evidence adduced in the particular case." (internal quotation marks omitted)).   Whether Spinosa's alleged actions, including signing letters to Coquina on TD Bank letterhead, holding conference calls with Coquina about its accounts, and meeting with Coquina at TD Bank to discuss account management, were related to and committed within the course of his employment or for the benefit of his employer's interests are issues of fact for the jury.

There are also issues of material fact with respect to elements of Coquina's fraudulent misrepresentation claim.   Whether Spinosa made false statements to Coquina, knew his statements to Coquina were false, and whether Coquina relied on those statements are questions

of fact for the jury.  *See Aronowitz v. Health-Chem Corp.*, 513 F.3d 1229, 1237 (11th Cir. 2008) ("The question of intent is generally a question of fact for a jury.").  Additionally, whether the misrepresentations caused Coquina's injuries is also a question of fact for the jury.  *See Arrowood Indem. Co. v. Dogali*, No. 09-1193, 2011 WL 2938262, at *3 (M.D. Fla. Jun. 24, 2011) ("Proximate causation is ordinarily a question of fact to be resolved by the jury.").  For these reasons, summary judgment is not proper on Coquina's fraudulent misrepresentation claim.

### D.     Count IV: Aiding and Abetting Fraud

To state a cause of action for aiding and abetting fraud, a plaintiff must allege (1) that there existed an underlying fraud, (2) the defendant had knowledge of the fraud, and (3) the defendant provided substantial assistance to advance the commission of the fraud.  *ZP No. 54 Ltd. P'ship v. Fidelity & Deposit Co. of Md.*, 917 So. 2d 368, 372 (Fla. Dist. Ct. App. 2005). "An employer is responsible for an intentional tort committed by an employee if the employee committed the tort while acting within the course and scope of his employment, with the purpose of benefiting the interests of the employer."  *Strickland*, 66 So. 3d at 414.

Genuine issues of material fact preclude summary judgment on this claim for many of the same reasons set forth above.  Namely, whether TD Bank, through Spinosa, had knowledge of the fraud or provided substantial assistance to advance the commission of the fraud present issues of fact for the jury.  Additionally, as discussed above, there are issues of fact with respect to agency and vicarious liability, particularly with respect to whether TD Bank employees acted with the purpose of benefiting TD Bank's interests.   Summary judgment is therefore inappropriate on this claim.

### E.     Affirmative Defenses

#### 1. *Failure to State a Claim and No Substantial Assistance*

Coquina seeks summary judgment on TD Bank's affirmative defenses based on a failure to state a claim and substantial assistance.  These affirmative defenses were stricken and are no longer at issue.

### 2. *Estoppel*

A party asserting the equitable doctrine of estoppel must prove that:  "(1) the party to be estopped misrepresented material facts; (2) the party to be estopped was aware of the true facts; (3) the party to be estopped intended that the misrepresentation be acted on or had reason to believe the party asserting the estoppel would rely on it; (4) the party asserting the estoppel did not know, nor should it have known, the true facts; and (5) the party asserting the estoppel reasonably and detrimentally relied on the misrepresentation."  *Martin v. Bervard Cnty. Pub. Schs.*, 543 F.3d 1261, 1266 n.2 (11th Cir. 2008).

Coquina argues that TD Bank's estoppel affirmative defense fails because there is no evidence that it misrepresented any material fact or that TD Bank relied on the alleged misrepresentation.  TD Bank fails to identify, or provide any evidence of, any misrepresentations Coquina allegedly made.  TD Bank also fails to identify, or provide any evidence of, Coquina's intent or TD Bank's reasonable and detrimental reliance.  Summary judgment is granted in Coquina's favor, and this affirmative defense is dismissed.

### 3. *Waiver*

"Under Florida law, 'waiver' is defined as 'the voluntary and intentional relinquishment of a known right or conduct which implies the voluntary and intentional relinquishment of a known right.'"  *Burger King Corp. v. E-Z Eating, 41 Corp.*, 572 F.3d 1306, 1315 (11th Cir. 2009) (quoting *Raymond James Fin. Servs., Inc. v. Saldukas,* 896 So. 2d 707, 711 (Fla. 2005)).  In support of its Motion, Coquina makes only a conclusory statement that TD Bank failed to

produce any evidence to support its claim.  As the moving party, Coquina fails to satisfy its burden of production.  *See Celotex Corp.*, 477 U.S. at 332 ("a conclusory assertion that the nonmoving party has no evidence is insufficient.").

### 4. *Unclean Hands and In Pari Delicto*

To prove an unclean hands affirmative defense, the defendant must establish that: "(1) Plaintiff's alleged wrongdoing is directly related to the claim against which it is asserted; and (2) Defendants were personally injured by Plaintiff's conduct."  *Thornton v. J Jargon Co.*, 580 F. Supp. 2d 1261, 1283 (M.D. Fla. 2008) (citing *Calloway v. Partners Nat'l Health Plans*, 986 F.2d 446, 450-51 (11th Cir. 1993)).  Under the *in pari delicto* defense, "a plaintiff who has participated in wrongdoing may not recover damages resulting from the wrongdoing."  *Liquidation Comm'n of Banco Intercontinental*, 530 F.3d at 1354.

"The unclean hands doctrine traditionally applies only to claims for equitable relief or in opposition to equitable defenses."  *Regions Bank v. Old Jupiter, LLC*, No. 10-80188, 2010 WL 5148467, at *6 (S.D. Fla. Dec. 13, 2010) (citing *Mitchell Bros. Film Grp. v. Cinema Adult Theater,* 604 F.2d 852, 865 n.26 (5th Cir. 1979)).  Here, Coquina seeks to recover only damages.  Thus, the unclean hands affirmative defense is inapplicable.  *See McAdam v. Dean Witter Reynolds, Inc.*, 896 F.2d 750, 756 n.10 (3d Cir. 1990).

Coquina's arguments as to the *in pari delicto* defense consist entirely of conclusory statements that there is no evidence to support this defense.  Coquina fails to meet its initial burden of production.  *See Celotex Corp.*, 477 U.S. at 332.

### 5. *Set-offs*

In tort actions where a set-off is permissible under Florida law, "set-off is not an affirmative defense to be considered by the jury but is a determination regarding damages to be

made by the court after the verdict is rendered." *KMS Rest. Corp. v. Wendy's Int'l Inc.*, 194 F. App'x 591, 598 (11th Cir. 2006) (quoting *Felgenhauer v. Bonds*, 891 So. 2d 1043, 1045 (Fla. Dist. Ct. App. 2004)).  I find set-off inapplicable as an affirmative defense in this case. However, if a verdict is returned in favor of Coquina, the Court will consider any set-offs in calculating damages.  This purported affirmative defense is dismissed.

### 6. *No Proximate Cause*

In its "no proximate cause" defense, TD Bank alleges that it did not proximately cause Plaintiff's damages.  The absence of proximate cause is not an affirmative defense; rather, it is "a requirement of plaintiff's cause of action put at issue by a general denial." *Clement v. Rousselle Corp.*, 372 So. 2d 1156, 1158 (Fla. Dist. Ct. App. 1979); *see also Currie v. Dollar Gen. Corp.*, No. 05-099, 2005 WL 1684161, at *1 (N.D. Fla. Jul. 12, 2005) (striking "no proximate cause" affirmative defense because it is "merely [a] denial[] and not [a] true affirmative defense[].").  Through its Answer to the Complaint, TD Bank has already asserted its denial that proximate cause exists.  (*See* Am. Answer ¶ 71, ECF No. 370).  I find proximate cause is not an affirmative defense that must be specially pled.  This purported affirmative defense is dismissed.

### 7. *Failure to Mitigate Damages*

In support of TD Bank's affirmative defense that Coquina allegedly failed to mitigate damages, the bank pleads that Coquina failed to conduct sufficient due diligence.  TD Bank essentially seeks to pursue the "failure to mitigate" affirmative defense based on an allegation that Coquina would have known that the deal was fraudulent had it conducted sufficient due diligence prior to investing.  A plaintiff's duty to mitigate damages, however, arises only after the defendant's tortious conduct and upon plaintiff's discovery of the fraud.  *See, e.g., Connelly v. Hyundai Motor Co.*, 351 F.3d 535, 542 (1st Cir. 2003) ("[T]here is no duty to mitigate

damages prior to sustaining an injury."); *Nilson–Newey & Co. v. Ballou,* 839 F.2d 1171, 1175 (6th Cir. 1988) (holding that the duty to mitigate damages "arises only after the defendant's tortious conduct, not before it"); *Anderson v. Dairy Farmers of Am., Inc.,* No. 08-4726, 2010 WL 3893601, at *11 (D. Minn. Sept. 30, 2010) (collecting cases).  Because TD Bank's legal theory is incompatible with a failure to mitigate defense, summary judgment is granted in favor of Coquina.  This affirmative defense is dismissed.

### 8.  *UCC and Florida Statutory Law Preemption*

TD Bank states that "Plaintiff's common law claims allege that TD Bank is liable for its conduct in processing payments and transfers, wiring funds, and other acts governed by the Uniform Commercial Code, including Article 4A, and Florida statutory laws . . .."   Case law does not support TD Bank's defense based on Article 4A.  The Eleventh Circuit has held that Article 4A "is not the exclusive means by which a plaintiff can seek to redress an alleged harm arising from a funds transfer."  *Regions Bank v. Provident Bank, Inc.,* 345 F.3d 1267, 1274-75 (11th Cir. 2003); *see also Gilson v. TD Bank, N.A.,* No. 10-20535, 2011 WL 294447, at *8 (S.D. Fla. Jan. 27, 2011) (holding Article 4A did not bar negligence claim).  Thus, summary judgment is granted in favor of Coquina with respect to TD Bank's affirmative defense based on Article 4A.

Coquina fails to present case law regarding Fla. Stats. § 670.101, *et seq.,* and § 673.1011, *et seq.*  Although I acknowledge that the state statutory scheme appears to be analogous to the UCC, Coquina has cited no case law to support the proposition that Florida state courts have interpreted Florida statutes in line with the Eleventh Circuit.  In the absence of any argument on this issue, I decline to dismiss TD Bank's claims with respect to the Florida statutes.  *See Resolution Trust Corp. v. Dunmar Corp.,* 43 F.3d 587, 599 (11th Cir. 1995) ("[T]he onus is upon

the parties to formulate arguments."); *Phillips v. Hillcrest Med. Ctr.,* 244 F.3d 790, 800 (10th Cir. 2001) (a "litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority or in the face of contrary authority, forfeits the point. The court will not do his research for him." (internal quotations omitted)).

### 9. *No Vicarious Liability*

Coquina argues that TD Bank's affirmative defense of vicarious liability is unsupported by the record.  As noted above, vicariously liability depends on a determination of agency principles, which raise genuine issues of material fact in this case.  *See Gilson*, 2011 WL 294447, at *3 ("Under Florida law, the existence of an agency relationship is ordinarily a question to be determined by a jury in accordance with the evidence adduced at trial." (internal quotations omitted)); *see Citibank*, 828 F.2d at 691.  Moreover, Coquina fails to present any evidence regarding this claim to justify summary judgment.  *See Celotex Corp.*, 477 U.S. at 323.

### IV. CONCLUSION

For the reasons explained in this order, it is **ORDERED and ADJUDGED** that Defendant TD Bank, N.A.'s Motion for Summary Judgment (ECF No. 225) is **GRANTED in part and DENIED in part**, as follows:

1. Summary judgment is **GRANTED** in favor of TD Bank as to Count I (RICO violation, 18 U.S.C. § 1962(c)) and Count II (conspiracy to commit RICO violation, 18 U.S.C. § 1962(d)).  These Counts are **DISMISSED**.

2. Summary judgment is **DENIED** as to Count III (Fraudulent Misrepresentation) and Count IV (Aiding and Abetting Fraud).  These Counts remain.

It is **FURTHER ORDERED and ADJUDGED** that Plaintiff's Motion for Partial Summary Judgment (ECF No. 227) is **GRANTED in part and DENIED in part**, as follows:

1. Summary judgment is **DENIED** as to Count III (Fraudulent Misrepresentation) and Count IV (Aiding and Abetting Fraud). These Counts remain.

2. Summary judgment is **GRANTED** in favor of Coquina as to the affirmative defenses of estoppel, unclean hands, set-offs, no proximate cause, failure to mitigate damages, UCC preemption. These defenses are **DISMISSED**.

2. Summary judgment is **DENIED** as to the affirmative defenses of waiver, *in pari delicto*, Florida statutory law preemption, and no vicarious liability. These defenses remain.

**DONE and ORDERED** in chambers, at Miami, Florida, this 19th day of October 2011.

_Marcia G. Cooke_
MARCIA G. COOKE
United States District Judge

Copies furnished to:
*Ted E. Bandstra, U.S. Magistrate Judge*
*Counsel of record*