# EXHIBIT A

1  anybody else involved in the discussion about this investment
2  opportunity?
3  A.  You mean in the very, very beginning?
4  Q.  Very, very beginning.
5  A.  In the very, very beginning, the first thing we did, was
6  we made a phone call to Michael Szafranski.  We'd gotten his
7  name from -- Ira Sochet had given Mel Michael Szafranski's
8  phone number, and that was the first person we called.
9         During that call, my recollection is, it was just
10 myself, George, and then another man who is kind of my
11 counterpart, Don Reed.  He works for the Scanio family, and
12 the Scanio family and the Hawn family have been making
13 investments together for 50 years, and he was in on that first
14 phone call.
15 Q.  Okay.  But he didn't continue on after that?
16 A.  No, Mr. Scanio was real sick.  In fact, he passed away a
17 couple weeks ago.  So Mr. Scanio was real sick and Don just --
18 didn't want to get -- they just didn't -- we're not doing
19 anything right now while my dad's -- while Mr. Scanio's so
20 ill.
21 Q.  Okay.  So just focusing then on those that did stay
22 involved throughout the period of time, yourself and George
23 had this call with Mike Szafranski to discuss about the
24 investments, or what happened in that conversation?
25 A.  Well, in that conversation, we were just kind of learning

1  the very basics about it, asking Mike what kind of investment
2  was it. He explained to us that it was confidential, legal
3  settlements that were settled out of court, that they were
4  sexual harassment cases. And he kind of explained to us --
5  went through a general description of them, and then explained
6  what kind of documentation, how it worked, what kind of
7  documents the plaintiff, the client got. What they -- what
8  arrangements there were, what documents there were between the
9  defendant and the plaintiff, and then what kind of
10 documentation there was between the plaintiff and the
11 investor.
12 Q. Okay. After you had this conversation with Mike
13 Szafranski, did you have an opportunity to see some documents?
14 A. Yes. After we had that conversation with Mike Szafranski,
15 I guess George probably talked to Mel about it, and told Mel
16 about it, and then we requested that Mike Szafranski send us a
17 copy of, some sample documents. And I guess Ira Sochet
18 allowed Mike Szafranski, or authorized Mike Szafranski to send
19 us the documents from his last investment.
20 Q. So that was something that you had an opportunity to look
21 at?
22 A. That's correct.
23 Q. Okay. And after -- I believe after the conversation, did
24 you have an opportunity to discuss with anybody else in the
25 Hawn group and the Hawn family about whether to pursue this

```
 1  investment opportunity?
 2  A.  Well, once we got the sample documents, then we started a
 3  due diligence phase, and during that phase a lot of different
 4  things happened.  I guess, one of the first questions -- well
 5  actually, when we learned that they were structured
 6  settlements that were pre-funded by the defendant, one of the
 7  first questions was, who's the depository of those funds.  It
 8  was TD Bank, that's the name he gave us.  We actually asked
 9  him if we could make the depository American Bank in Corpus
10  Christi.
11  Q.  When you say "depository," what do you mean?
12  A.  I mean, that was going to be the bank where the defendant
13  deposited the funds into the law firm's trust account.  So the
14  depository, I mean, is just -- I mean, it was the bank, it was
15  the bank, it's the same thing.
16  Q.  Okay.  And so you asked about whether this deposit account
17  could be held at American Bank?
18  A.  Yes, right there in Corpus Christi.  And Mike Szafranski
19  came back and said no, that it couldn't because it's a Florida
20  lawyer's trust account and Florida lawyer's trust accounts
21  have to be maintained in the State of Florida.
22  Q.  That's what Mike Szafranski told you?
23  A.  Oh, I'm sorry, who did I say said that?
24  Q.  No, no, you said Mike Szafranski.
25  A.  Mike Szafranski told us that.  So then at that point, what
```

December 1, 2011

```
 1  we kind of did was, divide up the tasks, the due diligence,
 2  everybody, George, George's family members, myself, Mel Klein,
 3  and Barrie Damson all have different expertise, all have
 4  different backgrounds.  And so we kind of divided up the due
 5  diligence so that the people who knew banking real well did
 6  the due diligence on the banking part, and that was
 7  George Hawn, Ben Wallace and Al Jones.  Al Jones is a -- I
 8  skipped over him, I'm sorry.
 9  Q.  No, that's okay.
10  A.  Al Jones is the president and CEO of American Bank and the
11  holding company for the American Bank in Corpus.
12  Q.  So let me just ask you this, this American Bank, can you
13  tell us, what was the relationship between George Hawn and
14  American Bank?
15  A.  Well, I guess George Hawn was the chair -- George Hawn and
16  Frank Scanio were the founders or the original two main people
17  that started American Bank, and he served until not too many
18  years ago, as the chairman of the board of the holding
19  company, and I guess maybe even the board of directors, but he
20  is one of the primary shareholders, he's one of the two main
21  owners of the bank.
22  Q.  That's George Hawn?
23  A.  That's George Hawn.
24  Q.  And Al Jones is the -- what's his position with the bank?
25  A.  Well, I think he is now -- he's the president of the bank,
```

```
 1  he's the number one guy that, at American Bank.  He's employed
 2  by American Bank, he's the number one guy.
 3  Q.  How big is American Bank, is it all over the state of
 4  Texas or, how much branches does it have?
 5  A.  You know, I don't know that for sure.  I think they've got
 6  maybe a dozen, something like that.  It's the largest
 7  community bank in Corpus Christi.
 8  Q.  Okay.  But it's primarily local in that --
 9  A.  Primarily local, it's in Austin, and a lot of the
10  communities around Corpus Christi, up to Austin, Texas.
11  Q.  Okay.  And you used --
12  A.  Okay, so I was --
13  Q.  That's okay.  Let me just ask you a question.
14          So you used the term "due diligence," it has been
15  said sometimes in this courtroom, but what did you mean, what
16  did you mean when you said that you -- that everyone was going
17  to do some part of the due diligence, what are you referring
18  to?
19  A.  Well, whenever you have the opportunity or an investment
20  is presented to you, you have to vet it, you have to work on
21  it, figure out all of the different aspects of it, see what
22  you believe the risk to be, what the opportunities to be, and
23  make a decision on whether you want to proceed with it or not.
24  And so when I say "due diligence," I'm talking about that time
25  frame between the date that you are presented with an
```

December 1, 2011

Case 0:10-cv-60786-MGC   Document 700-1   Entered on FLSD Docket 12/15/2011   Page 7 of 12

175

```
 1  investment and the work you do, up until the date you decide
 2  if you are or are not going to make that investment.
 3  Q.  Okay.
 4  A.  Everything that happens in that time period.
 5  Q.  Okay.
 6  A.  And actually the due diligence continues after you might
 7  make an investment too, but it's the work you're doing just to
 8  make sure that you're comfortable with what you're doing.
 9  Q.  Okay.  And so there were a few people that you mentioned
10  that had some banking expertise, and what was the due
11  diligence that they were tasked to do?
12  A.  Well, they were tasked with getting comfortable with TD
13  Bank, what we knew initially was that TD Bank was -- that TD
14  Bank stood for Toronto Dominion and that it was a
15  Canadian-based company.  And so the first question was, is TD
16  Bank subject to the same regulatory rules, the same compliance
17  rules, the same anti-money laundering, secrecy -- I mean
18  suspicious activities, know your customer, all those kinds of
19  compliance things that they were familiar with, that they
20  adhered to at American Bank.  The first question was, is a
21  Canadian bank subject to those same rules.
22  Q.  And what was your understanding after the due diligence
23  was done?
24  A.  That, their conclusion was that they are, subject to the
25  exact same rules.
```

```
 1              MS. SKOLNICK:  Objection, hearsay.
 2              THE COURT:  Sustained.
 3   BY MS. MANDEL:
 4   Q.  What did Coquina understand at the conclusion of that due
 5   diligence?
 6   A.  That they were subject to the exact same rules as a
 7   bank -- the bank in Corpus Christi that they owned.
 8   Q.  Okay.  You mentioned Barrie Damson along the way, what was
 9   his relationship to this group?
10   A.  Well, when we got the sample documents originally, Ben
11   Wallace, who's married to Patricia Hawn Wallace, he is a
12   lawyer, and practiced law for sometime, and he doesn't
13   currently have a law practice, although he does, I guess a
14   small law practice, but he primarily does legal work for the
15   family, the Hawn family, and he works out of our offices.
16              And so Mel and Ben Wallace initially looked at the
17   documents, and then after they started looking at the
18   documents, Mel suggested that we bring in another person,
19   which was Barrie Damson, someone he had known for many, many
20   years, and as we understood, had made many investments with --
21   over a long period of time, 20 years or something like that,
22   and he was a lawyer from Connecticut.  And so he wanted us to
23   invite him, Mr. Damson, to participate, in the due diligence,
24   in looking at this investment, and then ultimately, if we
25   decided to make it, to be a part of the investment with us.
```

1  And George was fine with that, and so that's how Barrie Damson
2  came into the fold.
3  Q. Okay. And did someone forward the sample set of documents
4  to Mr. Damson to review, as well?
5  A. Yes.
6  Q. Okay.
7  A. And then Mel and Barrie all had the documents, I had the
8  documents as well. And so the sample documents were looked at
9  by the three of them, primarily. But also I read them too,
10 just from an accounting standpoint, just to give any
11 information I might be able to, although, in this case, it
12 wasn't a lot.
13 Q. Okay. What did the set of documents consist of, if you
14 remember?
15 A. Well, I don't know if I can technically remember all of
16 them. I mean, there was a document where Scott Rothstein was
17 authorized to represent the plaintiff; there was an agreement
18 where the defendant and the plaintiff had reached a -- some
19 kind of settlement arrangement; there was a document where, in
20 this case, Ira Sochet had made a purchase of that stream of
21 money, those payments that were scheduled under the settlement
22 agreement, where Ira Sochet had agreed to purchase them from
23 the plaintiff for some sum of money. There was a note, a
24 promissory note where RRA, see, because, RRA was promising to
25 release to Ira Sochet the sum of money that he had purchased.

```
 1  And there might have been a few other documents, I'm -- you
 2  know, it wasn't my area of expertise, but I think that's most
 3  of them.  If you gave it to me, I could give you more
 4  information.
 5  Q.  I will give it to you in a minute, I will.
 6          And so after you had some opportunity to do this
 7  investigation of the documents and of the bank, what -- was
 8  there any other due diligence that anyone in the Coquina group
 9  did at the outset in -- after you first learned about this
10  opportunity?
11  A.  Yes.  Barrie Damson checked with some other lawyers that
12  he knew that had done structured settlements, so he checked
13  with some of his friends who had done sexual harassment cases,
14  had done structured settlements, did some investigation with
15  them.
16          MS. SKOLNICK:  Objection, hearsay.
17          THE COURT:  Sustained.
18          MS. MANDEL:  For purposes of background, Your Honor.
19          THE COURT:  Well, I think you can talk that you
20  talked to these people, and that based upon their
21  representations, what you did, as opposed to actually the
22  conversations.  All right?
23          MS. MANDEL:  Yes, thank you, Your Honor.
24  BY MS. MANDEL:
25  Q.  So Barrie Damson did some investigation on the structured
```

December 1, 2011

```
 1  settlements?
 2  A.  Yes.
 3  Q.  Themselves?
 4  A.  And Mel Klein did some investigation on the parties that
 5  were involved in these particular structured settlements, Mike
 6  Szafranski and Scott Rothstein.
 7  Q.  Okay.  In connection with that, what did Mel do?
 8  A.  Well, with -- I think Mel's already testified about the
 9  research he did on Scott Rothstein.  And just like everybody,
10  I mean, Scott looked like a really highly-qualified, you know,
11  well-rated by his peers, from a technical standpoint and from
12  an ethical standpoint, and he worked through Ira Sochet to do
13  an investigation on Mike Szafranski, and he told me that -- or
14  --
15          MS. SKOLNICK:  Objection, Your Honor.
16          THE COURT:  Sustained.
17  BY MS. MANDEL:
18  Q.  Other than the words that Mel Klein told to you, after you
19  had that conversation, what did you understand about, Mike
20  Szafranski's role was going to be in this investment
21  opportunity?
22  A.  That he was going to be the broker, the salesman, the
23  broker, the professional that is brokering and selling these
24  investments, and the independent verifier.
25  Q.  Okay.  Was he the -- when you say "independent verifier,"
```

REALTIME UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1  Q. And is Mr. Damson or Mr. Klein a partner?
2  A. Yes, ma'am.
3  Q. Where are they on this agreement?
4  A. They are not on this agreement.
5  Q. Did they ever sign the partnership agreement?
6  A. No, they did not.
7  Q. And So what is the difference between a partner and
8  someone who invested in Coquina Investments?
9  A. That would require legal conclusion and I'm not a lawyer,
10 but my understanding is in Texas, that you don't have to have
11 a written agreement to have a Texas general partnership.
12 Q. But you do have a written agreement?
13 A. We did have a written agreement in 2007.
14 Q. And to your knowledge, did Mr. Klein and Mr. Damson ever
15 sign that agreement?
16 A. I think I answered that earlier, they never signed.
17 Q. This is the only agreement?
18 A. That's correct.
19 Q. Now, their families aren't partners either, I mean, they
20 haven't signed on to this?
21 A. No, ma'am.
22 Q. Let's talk a little bit about this, about this partnership
23 and what Coquina is. Coquina doesn't have like its own
24 office, does it?
25 A. No, ma'am. Out of our office, we manage and we operate

DECEMBER 2, 2011