UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 10-60786-Civ-Cooke/Bandstra

COQUINA INVESTMENTS

       Plaintiff,

vs.

SCOTT W. ROTHSTEIN and
TD BANK, N.A.

       Defendants.
_____/

**Declaration of Catherine A. Ghiglieri**

I am the principal of Ghiglieri & Company. I was retained by Coquina Investments in this litigation as a banking expert, prepared an expert report and testified in the trial.

1. TD Bank's Standard Investigative Protocol (SIP), together with all the attachments, constitutes the set of procedures that the bank's Anti-Money Laundering ("AML") investigators were required to use to perform AML investigations.[1] Also, critical to this case, the SIP provides direction to the investigators in determining when the results of their investigation require filing a Suspicious Activity Report (SAR).[2] This set of documents was not produced by the bank until after the trial.

---

[1] TD_EMESS2_007182-7192.
[2] TD_EMESS2_0007182

1

2. When an AML alert was issued, the AML investigators were required to utilize the SIP to perform an investigation. The purpose of the SIP was to do the following:

"document standards used when performing an investigation within AML/BSA Operations, and to provide guidance for determining whether or not the results of an investigation meet the requirements for either of the following reports:

Currency Transaction Report (CTR)

Suspicious Activity Report (SAR)."

3. This procedure defines the bank's standards in performing an investigation of specific types of analyzed activity (see Attachment I). It provides information on the tools that need to be used and guidelines for determining if the activity being investigated is or is not reportable. "This procedure is used in conjunction with standard department processes for monitoring activity that require the use of standard investigative protocol. This procedure is used whenever activity being analyzed for potential CTR or SAR reporting is required."[3]

4. The SIP further stated that:

"the investigation must cover the activity that caused the alert, but should not be restricted to this activity."

"If at any point in the investigation it is determined that the activity may be check kiting or another type of fraud,...forward documentation of the activity to the unit manager for review and document this action...within the alert source...

---

[3] TD_EMESS2_0007182

2

"If at any point in the investigation it is determined that the investigation requires enhanced due diligence...refer the information and activity to EDDO [Enhanced Due Diligence Oversight unit]...

"If a determination cannot be made using the matrix-required tools, continue investigating using other investigative tools listed for the procedure on the matrix."[4]

5. Attachment 1 of the bank's Standard Investigative Protocol was to be referenced "when determining which investigative tools to use,"[5] and is a chart of standard investigative tools, some of which are required to be used and some of which are optional. Some of the investigative tools applicable to this case have not been produced such as the "Wire Review: Hot List Daily" and the "Wire Review: Velocity Reports."[6]

6. Attachment III to the Standard Investigation Protocol describes examples of "potentially suspicious activities or 'red flags,' including the following:

"Funds wired into and out of an account on the same day or within a relatively short period of time.

Wire transfers to or from countries that have been defined as requiring enhanced scrutiny (money laundering havens)."[7]

7. Had the Bank produced the SIP timely, the following would have been clear:

   a. The bank had a detailed set of procedures in place that the AML investigators were required to follow when accounts alerted.

---

[4] TD_EMESS2_0007183
[5] TD_EMESS2_0007182, 7186-87.
[6] TD_EMESS2_0007186
[7] TD_EMESS2_0007191

3

    b. The bank violated its own policies and procedures regarding investigating AML alerts. At a minimum, the brief summaries in the AML Monthly Alert Summaries failed to include any reference to many of the "tools" that investigators should have used.[8]

        i. For example, the "Wire Review: Velocity Reports" required a review of the D-3000 database, which would have shown the extremely high volume and frequency of wire transfer activity in the more than two dozen RRA related accounts. None of the monthly alert summaries produced immediately before the Coquina trial began showed that the related RRA accounts were reviewed or considered in making the determination that there was no suspicious activity.[9]

        ii. Even when more than one RRA account alerted in a given month, such as October 2008, no steps were taken to review all of the related accounts.[10]

        iii. In addition, the SIP required a review of bank statements and wire transfers. The AML Monthly Alert Summaries did not show any review of bank statements or wire transfer activity.[11]

    c. The bank's SIP specifically discussed 'red flags' of money laundering identical to those set forth in the banking regulatory guidance, i.e. funds wired in and out on the same day or short period of time, and funds wired

---

[8] TD_EMESS2_0007183
[9] TDBANK00001A-38A.
[10] Ibid.
[11] Ibid.

4

      to money laundering havens, but the bank chose to ignore these red flags.[12]

    d. The bank's systems for detecting suspicious activities were flawed in that the bank had no oversight of the investigators to ensure that the SIP was being followed, to ensure that the conclusions reached regarding the presence or absence of suspicious activity were appropriate, and to ensure that the bank was appropriately filing SARs.

8. If I had been provided the SIP, I would have concluded in my report and in my testimony to the jury that the bank's violations of its own SIP and the lack of oversight of investigators directly established that it did not act reasonably in connection with the RRA accounts. I would not have been limited, as I was (without the benefit of the SIP), to relying indirectly on the inferences suggested by all of the examples of red flags and conclude that TD Bank should have detected them.

9. In addition, I would have been able to challenge directly the expert report of TD Bank's banking expert, Ivan Garces, who opined that the bank acted reasonably in connection with the RRA accounts, merely by having systems in place to detect anti money laundering. Given the bank's failure to comply with its own policies and procedures, Mr. Garces' opinion would not have been credible.

---

[12] TD_EMESS2_0007191

Under penalty of perjury, I declare that the facts stated herein are true to the best of my knowledge and belief.

Dated: May 31, 2012

_____
Catherine A. Ghiglieri