## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 10-60786-Civ-COOKE/BANDSTRA

COQUINA INVESTMENTS,

     Plaintiff,

vs.

SCOTT W. ROTHSTEIN and TD BANK, N.A.,

     Defendants.

_____/

### <u>OMNIBUS ORDER ON MOTIONS FOR SANCTIONS</u>

THIS CASE is before me on Plaintiff's Fourth Motion for Sanctions (ECF No. 791), Defendant TD Bank, N.A.'s Notice of Production and Withdrawal of Certain Statements Made to the Court (ECF No. 825), and Plaintiff's Fifth Motion for Sanctions (ECF No. 845).  On April 26, 2012, I set an evidentiary hearing on the motions and ordered TD Bank and its counsel, Greenberg Traurig, to show cause why they should not be held in contempt for making incorrect representations to the Court.  (ECF No. 834).  I held hearings related to these filings and the show cause order on May 17, May 18, and June 12, 2012.  I also permitted the parties to file supplemental briefs after the hearings.  I have reviewed all of the parties' submissions, the evidence presented, the record, and the relevant legal authorities.  My findings of facts and conclusions of law are set forth below.

### I. PROCEDURAL HISTORY

This is an action by an investor group, Coquina Investments ("Coquina"), against TD Bank, N.A. ("TD Bank" or the "Bank") and Ponzi schemer and former attorney Scott Rothstein.  Coquina alleged that TD Bank, through its former regional vice president, Frank Spinosa, and

other employees, aided and abetting Rothstein's fraud and made fraudulent representations to Coquina.   As part of its defense, TD Bank claimed it did not know about, or knowingly participated in, Rothstein's fraud, and tried to cast Frank Spinosa and others as "rogue" employees, who acted on their own and without the knowledge of other TD Bank employees. TD Bank also maintained that its fraud monitoring procedures and systems were adequate and reasonable, and Coquina investors should have known Rothstein's investment opportunities were "too good to be true."

Trial in this matter began on November 8, 2011, and concluded on January 18, 2012.  In most cases that would be the end of the Court's involvement, save the resolution of post-trial motions related to limited procedural, or even substantive, issues at trial.  In this case, the end of a two-month jury trial signaled only the beginning of a barrage of filings making accusations of negligence and misconduct and admissions of incorrect statements to the Court.

In many ways, this is a case of too many cooks spoiling the broth.  Over 200 Greenberg Traurig attorneys were involved in this case.  There were separate teams of Greenberg Traurig lawyers to handle banking issues, document production, and pretrial and trial practice.  TD Bank retained two different firms to work on different aspects of the Rothstein fallout, but the firms did not have any mutual coordination.  One of the firms, Sullivan & Cromwell, then hired a consultant to perform work, which was relevant to the Rothstein litigation, but no one ever informed Greenberg Traurig.  As a result, it often times appears that this litigation was conducted in an Inspector Clouseau-like fashion.  However, unlike a *Pink Panther* film, there was nothing amusing about this conduct and it did not conclude neatly.

On March 26, 2012, Coquina filed a Fourth Motion for Sanctions, which relates to the Bank's Customer Due Diligence ("CDD") form, which Coquina contends the Bank altered with

the intent to mislead the jury.  On April 24, 2012, TD Bank filed a Notice of Production and Withdrawal of Certain Statements made to the Court, disclosing that a document titled "Standard Investigative Protocol," which the Bank's attorneys adamantly denied existed during trial did actually exist.  Also on April 24, 2012, the law firm of Greenberg Traurig filed a motion for substitution of counsel, indicating it would no longer represent TD Bank; TD Bank's new counsel would be McGuireWoods, LLP.  On May 10, 2012, Coquina filed its Fifth Motion for Sanctions, which relates to the Bank's production of fraud alerts in this case, which Coquina contends were incomplete.  These discovery issues came to light as a result of the ongoing production of documents in a related matter, *Emess Capital v. TD Bank*, Case No. 10-60882-JAL.

On May 17 and 18, 2012, I held a hearing on the Order to Show Cause, Coquina's Fourth Motion for Sanctions, and TD Bank's Notice.  I heard testimony from TD Bank employees Vincent Auletta, Amanda Spencer, and Sarah Pinkus; Jessica Smith, the technical point-of-contact for Greenberg Traurig at Stroz Friedberg, an outside vendor; Greenberg Traurig attorneys Mark Schnapp, Holly Skolnick, and Glenn Goldstein; and former Greenberg Traurig attorney Donna Evans.  Each witness had counsel present to represent him or her at the hearing. Additionally, I heard arguments from respective counsel for Coquina, TD Bank, Greenberg Traurig, and the individual witnesses.

On June 12, 2012, I held a hearing on Coquina's Fifth Motion for Sanctions.  I heard testimony from Greenberg Traurig attorneys Mark Schnapp and Holly Skolnick, and former Greenberg Traurig attorney Donna Evans.  Each witness had counsel present to represent him or her at the hearing.  Additionally, I heard arguments from respective counsel for Coquina, TD Bank, Greenberg Traurig, and the individual witnesses.

## II. LEGAL STANDARDS

### A.  Sanctions pursuant to Rule 37

Rule 37(b) of the Federal Rules of Civil Procedure provides that a district court may impose sanctions for a party's failure to comply with discovery orders.  Rule 37(c) provides that a district court may impose sanctions for a party's failure to supplement its responses to discovery requests.  The court may "penalize uncooperative attorneys or parties litigant in discovery proceedings by requiring the payment of reasonable expenses, including attorney's fees, caused by the failure."  *Serra Chevrolet, Inc. v. Gen. Motors Corp.*, 446 F.3d 1137, 1147 (11th Cir. 2006) (internal quotation marks omitted).  Permissible sanctions under Rule 37 are:

> (i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;
> (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;
> (iii) striking pleadings in whole or in part;
> (iv) staying further proceedings until the order is obeyed;
> (v) dismissing the action or proceeding in whole or in part;
> (vi) rendering a default judgment against the disobedient party; or
> (vii) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

Rule 37(b)(2)(A).  "[O]nly in a case where the court imposes the most severe sanction-default or dismissal-is a finding of willfulness or bad faith failure to comply necessary."  *BankAtlantic v. Blythe Eastman Paine Webber, Inc.*, 12 F.3d 1045, 1049 (11th Cir. 1994).  In other words, "[a] court may impose lesser sanctions without a showing of willfulness or bad faith on the part of the disobedient party."  *Id.*

District courts have "broad discretion" to impose sanctions for discovery violations, and to apportion fault between the attorney and the client.  *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005); *Devaney v. Continental Am. Ins. Co.*, 989 F.2d 1154, 1162 (11th Cir. 1993).  "[S]anctions for discovery abuses are intended to prevent unfair prejudice to litigants

4

and to insure the integrity of the discovery process." *Flury*, 427 F.3d at 944. "The magnitude of sanctions awarded is bounded under Rule 37 only by that which is 'reasonable' in light of the circumstances." *Carlucci v. Piper Aircraft Corp., Inc.*, 775 F.2d 1440, 1453 (11th Cir. 1985). "Permissible purposes of sanction include: 1) compensating the court and other parties for the added expense caused by the abusive conduct; 2) compelling discovery; 3) deterring others from engaging in similar conduct; and 4) penalizing the guilty party or attorney." *Id*.

**B. Sanctions under Court's Inherent Authority**

A court may also impose sanctions for litigation misconduct under its inherent power upon a finding of bad faith. *Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1306 (11th Cir. 2009) ("The key to unlocking a court's inherent power is a finding of bad faith."). A court may exercise its inherent powers "even if procedural rules exist which sanction the same conduct." *In re Mroz*, 65 F.3d 1567, 1575 (11th Cir. 1995). A court must, however, exercise its inherent powers "with restraint and discretion." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991).

"A party demonstrates bad faith by, *inter alia*, delaying or disrupting the litigation or hampering enforcement of a court order." *Eagle Hosp. Physicians*, 561 F.3d at 1306. "Without a 'smoking gun' statement from the plaintiff, . . . a district court makes a determination of bad faith by drawing inferences from the conduct before it." *Byrne v. Nezhat*, 261 F.3d 1075, 1125 (11th Cir. 2001).

The court's inherent sanctioning power "encompasses the ability to impose civil and criminal contempt." *Serra Chevrolet*, 446 F3d at 1147. "[A] court may make an adjudication of contempt and impose a contempt sanction even after the action in which the contempt arose has been terminated." *In re E.I. DuPont De Nemours & Company-Benlate Litig.*, 99 F.3d 363, 368

5

(11th Cir. 1996) (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 396 (1990)).

"A contempt sanction is considered civil if it is remedial, and for the benefit of the complainant.  But if it is for criminal contempt the sentence is punitive, to vindicate the authority of the court."  *Serra Chevrolet*, 446 F3d at 1147 (internal quotation marks omitted).  Generally, "[a] finding of a failure to comply with discovery orders is a finding of civil contempt."  *Id*.  However, a finding of contempt for discovery violations after a case is terminated will normally be criminal in nature.  *See In re E.I. DuPont-Benlate Litig*., 99 F.3d at 363 ("Where the contemnor cannot avoid the sanction by agreeing to comply with the original order to produce the documents, the sanctions order is determinate and therefore criminal in nature." (internal quotation marks omitted)).  The Eleventh Circuit has "uniformly regarded the imposition of a penalty against attorneys for a punitive purpose as a criminal contempt sanction."  *United States v. Skuthan*, 442 F. App'x 460, 461 (11th Cir. 2011) (quoting *United States v. KS & W Offshore Eng'g, Inc.*, 932 F.2d 906, 908 (11th Cir. 1991)).  The court must find that the attorney's conduct "rise[s] to the level of willfulness."  *Id*.

### III.  SUMMARY OF THE EVIDENCE

#### A.  Customer Due Diligence Form

Coquina's Fourth Motion for Sanctions relates to the Bank's CDD form, a record TD Bank's Cash Management Department generated for its customer accounts.  The document TD Bank, through Greenberg Traurig, produced to Coquina was in black and white, rather than in color, and did not contain a legible red banner running across the top of the page containing the words, "HIGH RISK," in capital letters, which appears in the original version of the document.  Further, the document produced to Coquina did not contain certain embedded information, which indicated when, and which, Bank employees saved, reviewed, or edited the document throughout

the relevant period (the "archive and editing information"). TD Bank maintains that the document was not doctored. According to the Bank and Greenberg Traurig, the header containing the words "HIGH RISK" appeared illegible as a result of a copying error. The black-and-white version of the CDD form was admitted into evidence at trial. Coquina used the document to show that the Bank knew the RRA accounts were "high risk."[1]

To figure out how this all came to be requires an understanding of how TD Bank kept this document in the ordinary course of business, how Greenberg Traurig collected and reviewed this type of document, and how Greenberg Traurig produced it to Coquina. This particular document existed in its native format in a Lotus Notes document database referred to as the "CDD database." (Pinkus Test., Hr'g Tr. 47-48, May 17, 2012, ECF No. 896). When viewed in its native form, the CDD form is in color. (*Id*. at 55). In its native form, the RRA CDD form contained red banners and the writing in the banners appeared in white. (*Id*. at 57; *see* Hr'g Ex. TDBANK-PINKUS 1). When printed in black and white, the banner appears in gray and the letters appear in black. (Pinkus Test., Hr'g Tr. 57, May 17, 2012).

During discovery, TD Bank made available the CDD database and TD Bank's former Cash Management Risk Officer Sarah Pinkus's personal computer for scanning and copying. (*Id*. at 48-49). An outside vendor scanned and copied the database and computer at Greenberg Traurig's direction. (*Id*. at 76-78). Greenberg Traurig sent these scanned files to Stroz Friedberg, an outside vendor that specializes in document collection, processing, and production. (Smith Test., Hr'g Tr. 108, May 17, 2012). Stroz received an electronic copy of the database in June 2010. (*Id*. at 108).

---

[1] According to TD Bank the Cash Management Department designates all law firms as "high risk." (TD Bank Resp. to Mot. 5). There is also evidence, however, that the Bank could waive that status. (Pinkus Test., Hr'g Tr. 80, May 17, 2012).

The normal review and production process went as follows.  When it received a batch of documents, Stroz Friedberg would process and upload them to a searchable document review platform, which contained TD Bank documents.  (*Id*. at 107-08).  Greenberg Traurig lawyers reviewed the documents on the review platform in html format in color, and selected relevant documents for production.  (*Id*. at 135-36; Evans Test., Hr'g Tr. 76-77, May 18, 2012, ECF No. 897).  Stroz Friedberg would then turn the documents selected for production into black-and-white tiff[2] files for production, and send them to Greenberg Traurig.  (Smith Test., Hr'g Tr. 109, 135 May 17, 2012).  Greenberg Traurig attorneys would review the tiff files to approve the production, i.e., they would conduct a "quality check" of the production.  (Evans Test., Hr'g Tr. 77-78, May 18, 2012).  Once approved, the documents were printed and produced to opposing counsel.  (*Id*. at 77-78).

Smith explained that printing tiff documents in black and white is a standard practice in document productions.  (Smith Test., Hr'g Tr. 113, May 17, 2012).  For purposes of the evidentiary hearing, Smith ran a few tests on the document and concluded that, to remain visible, the CDD form should have been printed to color tiff; even printing the document to black-and-white tiff would have rendered the header entirely black.  (*Id*. at 113-117, May 17, 2012; Hr'g Ex. TDBANK SMITH-1).  During the course of this litigation, Greenberg Traurig did not ask Stroz Friedberg to produce documents in color.[3]  (Smith Test., Hr'g Tr. 136, May 17, 2012).

Although the document in question was located in the CDD database Stroz Friedberg received in June 2010, in September 2010, Evans asked Pinkus for a hardcopy of the RRA CDD

---

[2] A tiff is an image of a document.  (Smith Test., Hr'g Tr. 113, May 17, 2012).

[3] Stroz Friedberg produced the CDD form in the *Emess* case, which is in color, with proper formatting, and includes the archive and editing information.  (Smith Test., Hr'g Tr. 117-19, May 17, 2012; Hr'g Ex. TDBANK SMITH-4).  To produce that document, Stroz processed the native Lotus Notes version of the CDD database and then printed the document to color tiff.  (Smith Test., Hr'g Tr. 119, May 17, 2012).

form.  (Pinkus Test., Hr'g Tr. 49, May 17, 2012).  Pinkus told her assistant to print the document and identify any attachments in pen.  (*Id*. at 51).  She testified that the normal manner of printing in her office was in black and white, and she did not print the document in color because Donna Evans never asked her to do so.  (*Id*. at 51, 58).  Her assistant mailed the black-and-white copy to Evans.  (*Id*. at 52).

As a result of the black-and-white printing, the "HIGH RISK" designation header was faint, but visible.  (*See* Hr'g Ex. TDBANK-PINKUS 2).  By printing out the document, some of the formatting was altered so that writing that appeared in native format running horizontally across the page appeared in a compressed column running vertically down the page.  (Smith Test., Hr'g Tr. 111-12, May 17, 2012; *see* Hr'g Ex. TDBANK-PINKUS 2, at 3-4).  Finally, the printed document did not include embedded information showing the document's archive and editing history.  (Smith Test., Hr'g Tr. 112, May 17, 2012).

Pinkus testified that she did not notice that the printout did not contain the document archive and editing history, and did not perceive the formatting problems as "incorrect."  (*Id*. at 71-72,).  The differences between the Lotus Notus record in native format and the printed document, however, are glaring.  At her December 22, 2011 deposition in *Razorback Funding, LLC, et al. v. Scott Rothstein, et al.*, Case No. 09-062943 (Fla. Cir. Ct.), Pinkus pointed out that the header was blacked out:

> Q.  And did you designate the account as a high risk account?
> A.  You know, it's a little hard to tell because the – the audit rails that are within the CDD aren't printed.  It -- It's -- it's the way the database works, everything has to be opened for it to print, and not everything is printed on this particular one.
>     So if you noticed on the very last page, 2437, it says the last edit, but it would tell you all the -- it would tell you all the history.
>      So -- and the -- the top line is also blacked out.  I can't read it on -- on the first page of the CDD where it tells you, the risk status is black.
> Q.  So that at page -- that portion that's black was the current risk status?

A.  Yeah.
Q.  Okay.  But then there's another portion of this document, or to the system, which could be printed out that would give you the audit history --
A.  Right.
Q.  -- for the CDD?
A.  Right.  It doesn't tell you, like, the data that was changed, but it -- it tells you the movement from status to status.

(Pinkus Dep. 46-47, Hr'g Ex. TDBANK-PINKUS 3).  Greenberg Traurig attorneys were present at the deposition.  Coquina's counsel was not present at the deposition, but at some point received a copy of the transcript because they used other portions of this deposition transcript at trial.

According to the evidence presented, there were instances during discovery when Greenberg Traurig produced documents directly to plaintiffs without Stroz's participation. (Smith Test., Hr'g Tr. 109, May 17, 2012).  The production of the CDD form appears to be one of those instances.  (*Id*.)  Greenberg Traurig produced the CDD form at issue to Coquina as a pdf.  (Hr'g Tr. 101, May 17, 2012; Hr'g Ex. P702).  In other words, instead of producing the document in native format or as a color tiff, Greenberg Traurig scanned the document Pinkus had sent to Evans and prepared a .pdf image of the document for production.  (Def.'s Resp. to Fourth Mot. for Sanctions 2-3, ECF No. 794).

Greenberg Traurig's policy was to produce documents in the format in which they were kept in the normal course of business.  (Evans Test., Hr'g Tr. 75, May 18, 2012).  Holly Skolnick, counsel for TD Bank, also made a similar representation to Magistrate Judge Bandstra in a pretrial hearing on Coquina's motion to compel the production of documents in native format.  (Hr'g Tr. 30, Jul. 12, 2011, ECF No. 870).  There, she assured Judge Banstra that a third-party vendor was conducting the production and that every document TD Bank kept electronically was "reproduced in tiff format, searchable, and with 34 columns of metadata."  (*Id*.

at 29-30).   Judge Bandstra eventually entered an Order denying the motion to compel documents in native format.  (ECF No. 377).

According to Evans, in this case, Greenberg Traurig had been under the mistaken impression that the CDD forms were kept in hardcopy in the ordinary course of business, which is why the firm produced the documents as pdfs.  (*Id*. at 75-76).  Evans testified that a senior associate at Greenberg Traurig confirmed to her that the CDD forms were kept in hardcopy.  (*Id*. at 76).  Obviously, that information was incorrect.  A simple search on the Stroz Friedberg database or even a phone call to Pinkus would have quickly revealed that TD Bank kept the CDD forms in Lotus Notes.  Based on the evidence presented, it does not appear that counsel took either of those steps.

### B.  Standard Investigative Protocol

On April 24, 2012, TD Bank filed a Notice of Production and Withdrawal of Certain Statements made to the Court.  The Notice confirmed the existence of a document titled "Standard Investigative Protocol," which Greenberg Traurig attorneys had denied existed during trial.

The production of this type of document was litigated before Judge Bandstra during discovery in this case.  The document was responsive to an October 22, 2010 request for documents, which requested TD Bank to produce all account opening and "Know Your Customer" policies and procedures, all policies and procedures relating to the various banking regulations, and all policies and procedures relating to compliance.  (ECF No. 95-1, Req. Nos. 1, 3, 13, 16, 17).  On March 10, 2011, Judge Bandstra overruled TD Bank's objections to Coquina's requests for documents and ordered TD Bank to produce all responsive documents with respect to Document Request Nos. 1-30.  (ECF No. 133).  Throughout the pretrial and trial

phases, TD Bank, through Greenberg Traurig, insisted it had produced all responsive documents. The Standard Investigation Protocol document was clearly responsive to Coquina's request for documents—it provided guidance concerning reportable and non-reportable suspicious activity and provided additional procedures.  (*See* Spencer Test., Hr'g Tr. 204-07, May 17, 2012).

Whether this particular document existed became a heavily contested issue at trial after Greenberg Traurig's late production of some key documents brought the issue to the fore.  On November 22, 2011, in the midst of trial, TD Bank produced 150 pages of new documents to Coquina.  Because these documents raised new factual issues with respect to the Bank's knowledge of Rothstein's fraud, I ordered TD Bank to make certain Bank employees available for deposition and imposed monetary sanctions on TD Bank in the form of attorney's fees and costs.  (ECF No. 660).

On December 4, 2011, Coquina deposed TD Bank's Manager of the Enhanced Due Diligence Department, Amanda Spencer, who testified that when an account alerts, the AML investigator would follow the Standard Investigative Protocol.  (Spencer Dep. 24-27, ECF No. 717-1).  She then stated:  "In 2008 and 2009 [TD Bank] did have a procedure that was called Standard Investigative Protocol." (*Id*.)  Although she was unsure where the document was stored now, she stated that prior to 2009 "[i]t was stored in [the Bank's] Procedures folder in [the Bank's] share drive"; specifically, on the AML department's computer system.  (*Id*.)  Spencer testified that she was never asked to produce a copy of it in this litigation.  (*Id*.)  At the end of the deposition, Coquina's counsel asked the Bank for the document.  (*Id*. at 64).

On January 9, 2012, Coquina's counsel raised the issue of the unproduced Standard Investigative Protocol document with the Court.  (Trial Tr. 10-13, Jan. 19, 2012).  Mark Schnapp, TD Bank's counsel, stated that, to his knowledge, Greenberg Traurig had produced

every relevant protocol, and there was no "hidden document regarding investigative protocol." (Trial Tr. 17-24).  Skolnick told the Court that Evans had followed up with Spencer, who stated that she was not talking about a document, just a general policy and a checklist.  (*Id*.)  Schnapp said that he was told "consistently"—presumably by the Bank—that there was no such document.  (*Id*.)  On January 10, 2012, Schnapp told the Court that he was advised—again, presumably by Bank representatives—that there were no other documents other than the Standard Investigative Tools document already produced to Coquina.  (Trial Tr. 125-126, Jan. 10, 2012).  Schnapp produced another copy of the Standard Investigative Tools document, which consists of an Excel spreadsheet checklist, to Coquina in court.

On January 11, 2012, Coquina filed its Third Motion for Sanctions based on the missing Standard Investigative Protocol.  (ECF No. 717).  On January 13, 2012, TD Bank filed a response to the motion, which included the affidavits of TD Bank's Senior Vice-President of Global AML Enhanced Due Diligence Vincent Auletta and Spencer, both denying the existence of the document.  (ECF No. 727).  Also on January 13, 2012, Evans represented to the Court that she spoke to Bank representatives and determined that the document did not exist.  (Trial Tr. 25-34, Jan. 13, 2012).

Spencer testified in her affidavit that when she referred to a standard investigative protocol during her deposition, she meant the Standard Investigative Tools Excel spreadsheet. (Spencer Decl. ¶¶ 3-4, ECF No. 727-2).  She stated unequivocally that, to her knowledge, "there is no document that was utilized by the AML Department in 2008 and 2009 titled 'Standard Investigative Protocol.'"  (*Id*. ¶ 5).

Auletta stated in his affidavit that the Standard Investigative Tools was "not a procedure, policy or protocol"; rather the document "was intended to list investigative tools for many of the

transactions that occur at the Bank" and "lists resources an investigator may use, or should use . . . when addressing [certain] procedures."  (Auletta Decl. ¶ 3, ECF No. 727-3).  He also stated unequivocally that to his knowledge "there is not a document titled 'Standard Investigative Protocol' which was utilized by the AML or EDDO Departments in 2008 and 2009."[4]  (*Id.*)

TD Bank and Greenberg Traurig continue to maintain it was all just a big misunderstanding.  In line with her affidavit, Spencer testified at the evidentiary hearing before me that when she referred to "standard investigative protocol" during her deposition she meant the Standard Investigative Tools Excel spreadsheet.  (Spencer Test., Hr'g Tr. 173-78, May 17, 2012).  She testified that she and others in the AML Operations Department used the name "standard investigative protocol," when they referred to the Excel spreadsheet.  (*Id.* at 165).  Spencer testified that she never used the document titled "Standard Investigative Protocol."  (*Id.* at 170).

Auletta testified that he only knew about the Standard Investigative Tools Excel spreadsheet, which he helped develop; he saw and read the Standard Investigative Protocol document for the first time on April 17 or 18, 2012; the Enhanced Due Diligence unit where he worked did not use the Standard Investigative Protocol document; and he and others referred to the Standard Investigative Tools Excel spreadsheet as the "standard investigative protocol." (Auletta Test., Hr'g Tr. 215-19, 230-33, May 17, 2012; Auletta Test., Hr'g Tr. 44-45, May 18, 2012).  He considered the Standard Investigative Tools Excel spreadsheet as "the standard investigative protocol" for the Enhanced Due Diligence unit, which is a subset of the AML BSA department.  (Auletta Test., Hr'g Tr. 213-16, May 17, 2012).

The evidence is clear that Greenberg Traurig, Auletta, and Evans all had a copy of the

---

[4] It is clear, as discussed in more detail below, that as of the date of Auletta's affidavit, the Standard Investigative Protocol document existed and was in Auletta's possession.

document before this case went to trial.  Greenberg Traurig had access to a copy of the Standard Investigative Protocol document since June 2010, when TD Bank made available to Stroz Friedberg a database that contained that document.  (Hr'g Tr. 209-211, May 17, 2012).  In August 2009, Auletta received an e-mail containing four attachments labeled "standard investigative protocol," one of which was the document at issue here.  (Auletta Test., Hr'g Tr. 220-22, May 17, 2012; Hr'g Ex. TDBANK-AULETTA 4).  Of all of the attachments, Auletta opened only one, which was the Excel spreadsheet.  (Auletta Test., Hr'g Tr. 220-22, May 17, 2012). In April 2011, Auletta, through his assistant Tina Petrarca, forwarded that e-mail to Evans, including its attachments.  (Auletta Test., Hr'g Tr. 222-28, 32-33, May 17, 2012; Hr'g Ex. TDBANK-AULETTA 6).  Evans forwarded Petrarca's e-mail to her secretary and asked her to print them out.  (Evans Test., Hr'g Tr. 68, May 18, 2012).  It is unclear whether Evans reviewed the printouts or what she did with those documents.

For the fault of one mouse click this matter would not be before me.  Although this document was on the document review platform and in Auletta's and Evans's respective e-mail accounts, no one ever seems to have reviewed it.  According to their testimonies, neither Auletta nor Evans opened and reviewed all of the attachments in April 2011 or anytime after that until this issue finally came to light.  (Auletta Test., Hr'g Tr. 225-227, May 17, 2012; Auletta Test., Hr'g Tr. 31-32, May 18, 2012).  The evidence also suggests that none of Greenberg Traurig's attorneys reviewed or selected the Standard Investigative Protocol document for production on the Stroz Friedberg document review platform.

What is especially concerning to me is what happened—or, more specifically, what did not happen—after Spencer's deposition.  The evidence before me suggests that Greenberg Traurig failed to conduct a thorough search for the document.  Evans and other Greenberg

Traurig attorneys communicated with Bank representatives, including Auletta and Spencer, in December 2011 and January 2012, and confirmed that there was no document titled "Standard investigative Protocol." (*See* Spencer Test., Hr'g Tr. 179, 183, May 17, 2012; Evans Test., Hr'g Tr. 70-71, May 18, 2012; ECF No. 887-1).  In around January 2012, Evans ran an unfruitful key-term search of her computer files for "standard investigative protocol."  (Evans Test., Hr'g Tr. 70, May 18, 2012).  Evans, however, could have located the Standard Investigative Protocol document by simply reviewing the e-mails Petrarca and Auletta had sent to her.  (*See id*. at 67-68).  Although Evans and a senior associate searched hardcopy documents that Auletta sent to her in January 2012, apparently no one searched the obvious place—the Stroz Friedberg word searchable document review platform—even though they knew that TD Bank's documents were hosted on that system.  (*See id*. at 71-72; Hr'g Tr. 209-211, May 17, 2012).  That was a simple, straightforward way in which they could have located this seemingly elusive document.

Auletta and Spencer also could have located this document by searching in the AML BSA shared drive, where the document was located.  (Spencer Test., Hr'g Tr. 180-84, 190-94, 199, May 17, 2012).  The testimony makes clear that neither Spencer nor Auletta ran a search of the entire AML BSA drive before signing their affidavits.  (*See, e.g*., Spencer Test., Hr'g Tr. 199-200, May 17, 2012; Auletta Test., Hr'g Tr. 26, 46, May 18, 2012).  Why?  Because the Bank was so firmly rooted in its belief that the document did not exist that it failed to conduct a comprehensive search to find it.  At most, Auletta and Spencer searched their respective drives and computers, which revealed nothing.  (Auletta Test., Hr'g Tr. 45-46, May 17, 2012).

### C.  AML and Fraud Alerts

On May 10, 2012, Coquina filed its Fifth Motion for Sanctions, which relates to the Bank's production of fraud alerts in this case.  During this action, counsel for the Bank produced

16

a total of around 100 fraud alerts, which TD Bank generated for Rothstein's bank accounts. During discovery in *Emess*, the Bank produced a certain document,[5] which states that the Bank investigated a larger number of fraud alerts.  The Bank contends that the production of the document was inadvertent and the alerts to which the document refers are privileged and TD Bank did not have a duty to produce them.

The production of fraud alerts was litigated before Judge Bandstra during discovery and before me during trial.  Coquina maintains that the document and the underlying alerts to which it refers are responsive to an October 22, 2010 request for documents, which requested TD Bank to all internal compliance audits TD Bank performed, and all fraud detection and/or fraud alert reports (ECF No. 95-1, Req. Nos. 22-29), and a January 6, 2011 request for documents, which asked for all documents relating to any TD Bank compliance deficiencies, remedial efforts, and any internal and external investigations (ECF No. 902-1, Req. Nos. 32-36).  On March 10, 2011, Judge Bandstra overruled TD Bank's objections to Coquina's requests for documents and ordered TD Bank to produce all responsive documents with respect to Document Request Nos. 1-30.  (ECF No. 133).  On March 18, 2011, TD Bank sought, and the Court granted, a brief extension of time to fully complete its production of documents as to five requests.  (ECF Nos. 137, 143).  TD Bank represented that, otherwise, it had complied with its discovery obligations as to the other document requests.  (*Id*.)  Coquina never filed a motion to compel the production of documents responsive to Request Nos. 32-36.

In an April 7, 2011 deposition, Auletta, as TD Bank's Rule 30(b)(6) witness, testified that there were no AML alerts for Rothstein's accounts until late September 2009, and less than 5 alerts thereafter.  (Auletta Dep. 269-270, ECF No. 883-2).  However, on October 31, 2011, about

---

[5] Because TD Bank has claimed the document is privileged, I will not discuss the details of the document's contents here.

a week before trial began, TD Bank produced an additional 150 pages worth of AML alerts from September to November 2009.  (*See* ECF No. 599).  In November 2011, TD Bank produced more alerts spanning 2008 to 2009.  (*See id*.)

TD Bank presented evidence that the alerts to which the potentially privileged document referred were not AML or fraud alerts that TD Bank generated during the Rothstein Ponzi scheme.  It appears that on April 26, 2011, TD Bank retained the law firm of Sullivan & Cromwell to assist in certain banking matters.[6]  (ECF No. 894; Hr'g Tr. 8, Jun. 12, 2012, ECF No. 903).  On May 12, 2011, Sullivan & Cromwell engaged a consultant[7] to review the Rothstein accounts.[8]  (*Id*.)  Having reviewed the evidence, I find that the alerts generated through the consultant's work were not AML or fraud alerts TD Bank generated in the ordinary course of its business while the Rothstein accounts were open and operational.  (*Id*. at 12).  On October 19, 2011, the consultant provided to TD Bank's Audit Committee an interim report on its work. (ECF No. 894).

The consultant's work occurred after the Ponzi scheme was discovered, after this action was filed, and after discovery in this case had closed.  (Hr'g Tr. 11, Jun. 12, 2012).  TD Bank argues that the consultant's report is work product and TD Bank did not have an obligation to supplement its privilege log or otherwise notify Coquina of the report.[9]  Local Rule 26.1(g)(3)(C)

---

[6] Because the engagment letter has not been made public, I will not disclose the details of the law firm's work in this Order.

[7] Because the engagement letter with the consultant and the consultant's reports have not been made public, I will not disclose their details in this Order.

[8] The evidence also shows that the consultant had been working with TD Bank as far back as December 15, 2010, to conduct an "enterprise AML risk assessment" to "align with industry standards for the nature, size, and complexity of any organization such as TD Bank."  (Pl.'s Ex. 1, TD/Coquina 004189).  TD Bank represented at the hearing that the work referred to in the December 2010 Audit Report was unrelated to the work undertaken in connection with the Rothstein accounts.  (Hr'g Tr. 51-52, Jun. 12, 2012).  The consultant's report itself makes no mention of the Rothstein accounts.

[9] Counsel for TD Bank provided the redacted version to the Court for in camera review.  To the extent TD

provides that a party is not required to include in a privilege log "written and oral communications between a party and its counsel after commencement of the action and work product material created after commencement of the action."

Even if the consultant's report is not work product protected, TD Bank contends that it still did not have a duty to supplement its production because the report was not created until after the close of discovery in April 2011.[10]   Courts have held that a party does not have a continuing obligation to produce documents created after discovery closes.  *See, e.g.*, *Pharmacy, Inc. v. Am. Pharm. Partners, Inc.*, No. CV 05-776, 2008 WL 4415263, at *3 (E.D.N.Y. Sept. 24, 2008) ("[A] party is under no duty to produce documents which did not exist prior to the close of discovery."); *Hnot v. Willis Grp. Holdings, Ltd.,* No. 01 Civ. 6558, 2006 WL 2381869, at *5 (S.D.N.Y. Aug.17, 2006); *In re High Fructose Corn Syrup Antitrust Litig.,* No. 95-1477, 2000 WL 33180835, at *3 (C.D. Ill. Jul. 19, 2000).  However, at least one other court has held that a party must supplement its discovery responses where the later-created materials "make any of their prior responses in some material respect incomplete or incorrect."  *See, e.g.*, *Pizza Public Co. v. Tricon Global Rests., Inc.*, No. 99 Civ 12056, 2000 WL 1457010, at *2 (S.D.N.Y. Sept. 29, 2000).  I decline to decide, upon the limited evidence and arguments before me on the issue of privilege, whether this document should have been produced—albeit in redacted form.  This is a question more appropriately before the Honorable Joan A. Lenard, who is presiding over the *Emess* matter.  I find that, at a minimum, however, TD Bank should have been provided the

---

Bank argues that Coquina's motion must be denied because it failed to file a motion to compel or an application to the OCC to obtain these materials, I note that Coquina can hardly be faulted for failing to make the proper requests to obtain documents they had no idea existed until recently.

[10] It is well estbalished that the obligation to supplement discovery responses continues after discovery. Fed. R. Civ. P. 26(e)(1).  This Court's Scheduling Order reflects this continuing obligation by requiring parties to supplement discovery responses within ten days of receipt or notice of new or revised information.  This requirement, however, does not create a new and additional obligation to produce document *created* after close of discovery.

document to trial counsel, Greenberg Traurig.

Coquina contends that Greenberg Traurig elicited false testimony from its expert, Ivan Garces, who did not have access to the consultant's report. Garces testified at trial that TD Bank made a reasonable risk assessment that the RRA accounts were not high risk, and it implemented reasonable systems and procedures to monitor the RRA accounts and comply with Bank Secrecy Act requirements. (Trial Tr. 45, 71, Jan. 9, 2012, ECF No. 816; Trial Tr. 24, 39, 46-47, Jan. 10, 2012, ECF No. 817). TD Bank argues that Garces had access to all relevant AML alerts, which was a proper basis for Garces' opinion. (ECF No. 900). Further, Coquina had a copy of the December 2010 Audit Report at trial to cross-examine Garces' conclusions. (*Id.*)

The evidence indicates that Greenberg Traurig did not intentionally keep the results of the consultant's report from Garces. In fact, the trial lawyers in this case consistently testified they had no knowledge that this work was taking place; they never saw the interim report or any other materials associated with the consultant's work until long after trial in this matter was over. (Hr'g Tr. 15-16, 19, Jun. 12, 2012; Evans Test., Hr'g Tr. 61-62, 65, Jun. 12, 2012; Skolnick Test., Hr'g Tr. 78-79, Jun. 12, 2012; Schnapp Test., Hr'g Tr. 82-83, Jun. 12, 2012).

**D. Other Issues**

During these proceedings, Coquina brought other issues to the Court's attention regarding what it contends demonstrates further discovery violations and fraud on the court. First, Coquina maintains TD Bank's Rule 30(b)(6) witness Carlos DiToro provided false or misleading testimony during his deposition with regard to a fired employee. At his April 8, 2011 deposition, DiToro testified that no other employee except for Matthew Brennan had been disciplined for a bank policy or code of conduct violation. (DiToro Dep. 306, ECF No. 895-2). A December 2010 Audit Report, however, indicates that the AML Program Director "was replaced" during a

20

review of TD Bank's monitoring and risk assessment systems. (Pl.'s Ex. 1, TD/Coquina 004180). In her December 12, 2011 deposition in *Razorback*, the former AML Program Director, Teresa Baker-Smith, testified that on November 15, 2010, a human resources representative terminated her effective immediately. (Baker-Smith Dep. 10-11, Pl.'s Ex. 3). She testified that her termination was "due to a global reorganization." (*Id*.) Having been presented with no evidence that TD Bank terminated Baker-Smith for any reason other than a global reorganization, I cannot conclude that DiToro made false statements at his deposition.

Second, Coquina identifies e-mails that TD Bank never produced to it in this litigation, but produced in *Emess*. (ECF No. 895). One document consists of a November 4, 2009 e-mail exchange among then Regional Vice-President Frank Spinosa, TD Bank's President in Florida, Kevin Gillen, TD Bank senior counsel Richard Berman, and TD Bank's press officer, Rebecca Acevedo. In the e-mail exchange Gillen states that Spinosa "did in fact author, sign and issue these letters." (ECF No. 895-1). "These letters" refers to the so-called "lock letters" Spinosa provided to Rothstein. Coquina also identifies a previously unproduced October 31, 2009 e-mail in which Spinosa sent Gillen and TD Bank executive Thomas te Riele copies of the lock letters. (ECF No. 909-1). Gillen replied, likely mistakenly, to Spinosa: "Frank called me on my drive back from the hospital in NJ. What a bizzar [*sic*] story. Not really sure where our risk might be now. Have no clue why he would have provided these letters." (*Id*.)

The critical question is why TD Bank failed to previously disclose these e-mails to Coquina, as they are both clearly relevant and responsive to Coquina's requests for documents. TD Bank explains that the November 4, 2009 e-mail chain was identified in its privilege log. According to TD Bank, Coquina did not challenge the claim of privilege as to this document. The privilege log entry states that the document is being withheld because it concerns a

"transmittal of confidential attorney communication made in the rendition of legal services." (ECF No. 909-2).  TD Bank had, at a minimum, an arguable claim of privilege as to a portion of that e-mail chain because it reflected a request for advice of counsel.  Other portions of the e-mail chain, however, appear to be discoverable.  As to the October 31, 2009 e-mail, it remains unclear why it was never produced to Coquina.  It does not appear that this document was withheld for privilege, and for good reason—the October 31, 2009 e-mail does not include counsel or reflect attorney-client communications.  TD Bank, through Greenberg Traurig, should have produced this entire e-mail chain to Coquina.

### III. CONCLUSIONS

**A.  Sanctions Against Greenberg Traurig and TD Bank are Warranted**

In reaching my conclusions below I have conducted a cumulative review of all of the discovery mishaps in this matter, which reveal a pattern of discovery violations.  I will note at the outset that it is difficult to accept that it was a mere coincidence that the late productions on the eve or during trial contained highly relevant documents.  On October 31, 2011, TD Bank, through Greenberg Traurig, produced pages of AML alerts.  In November 2011, TD Bank, through Greenberg Traurig, produced 150 pages of documents, which included e-mails among AML employees questioning whether the Rothstein accounts should be further investigated.  Also in November 2011, TD Bank, through Greenberg Traurig, produced additional pages of fraud alerts.  After trial, Coquina discovered that the CDD form TD Bank, through Greenberg Traurig, produced to it did not contain relevant writing and archive and editing information.  Also after trial, Greenberg Traurig produced the Standard Investigative Protocol, a document outlining certain investigatory steps TD Bank employees had to take.  Coquina subsequently learned that TD Bank hired a consultant whose report undermined some of the conclusions trial

expert Ivan Garces reached.  Finally, Coquina discovered two previously undisclosed e-mails containing evidence suggesting that Frank Spinosa drafted the lock letters and that Kevin Gillen was less than candid on at least one point in his testimony.

Based on my review of all of the evidence, and considering the pattern of discovery abuses before, during, and after trial, I find that Greenberg Traurig acted negligently in failing to comply with its discovery obligations in this case, and TD Bank acted willfully in failing to comply with its discovery obligations and assist its outside counsel to properly litigate this case in accordance with the Federal Rules of Civil Procedure and the Federal Rules of Evidence.

Greenberg Traurig acted negligently in failing to produce the CDD form in a manner that preserved the document's qualities.  It is clear that, to preserve all its original qualities, the CDD form should have been produced in native format or color tiff.  Evans testified that Greenberg Traurig produced this document in a separate pdf production without Stroz Friedberg's involvement because she believed TD Bank kept the document in hardcopy in its ordinary course of business.  This explanation is hard to believe.  Upon review of the printout, Greenberg Traurig or in-house counsel should have immediately realized, at a minimum, that some information was lost due to the formatting errors, which are clearly visible on the face of the document.  From looking at the formatting errors on the face of the document it is clear that it existed originally in some sort of electronic format.  That should have prompted questions about how TD Bank kept the documents.  Further, it is reasonable to infer that at least one Greenberg Traurig attorney saw the original, html color document during discovery on the Stroz Friedberg document review platform.  That placed the attorneys on notice that the document existed on Lotus Notes in native format and was originally in color.   Finally, it is clear from a review of the initial printout—which contained a faint and barely legible banner—that further printing or copying of the

document would result in degradation of the document's clarity or quality.

TD Bank acted willfully in failing to rectify Greenberg Traurig's error or allowing it to endure.[11]  TD Bank hides behind Greenberg Traurig's mistakes and points to Pinkus's deposition testimony to wash its hands clean of any involvement in this production of documents.  TD Bank would have this Court believe that, except for Pinkus, none of its approximately fifteen in-house lawyers or its representatives who sat through trial had any idea what the critical documents in this case were supposed to look like, and therefore cannot be held responsible for not noticing that the CDD form contained blacked out headers and lacked archive and editing information during pretrial or trial proceedings.  That explanation defies credulity.  Having reviewed the evidence and made the appropriate credibility determinations, I do not accept that this was the case.

I also find that Coquina suffered prejudice as a result of the production of the incomplete CDD form.  TD Bank argues that Coquina suffered no prejudice because the document refers to the RRA account as "high risk" in several places other than the banner.  TD Bank also notes that the use of the color red was not significant—it was the standard color Commerce Bank, TD Bank's predecessor, used on its documents.  TD Bank would have had the opportunity to explain these document features at trial.  The fact that the document contained an all-caps red header stating "HIGH RISK" may have driven home for jurors that the Bank should have paid particular attention to this account, despite TD Bank's evidence that every law firm was designated high risk and the color had no particular significance.  I cannot speculate what the exact impact of the color document would have been, but I can conclude from the evidence before me that Coquina was deprived of the ability to capitalize on these document features at trial due to Greenberg

---

[11]  The evidence presented, however, does not support a finding that TD Bank or Greenberg Traurig intentionally doctored or altered the document.

Traurig's inadequate production and TD Bank's willful blindness.  *Cf. Inmuno Vital, Inc. v. Telemundo Grp., Inc.*, 203 F.R.D. 561, 573 (S.D. Fla. 2001) (last-minute disclosure of document prejudiced plaintiff because it "significantly diminished" the plaintiff's ability to use the document effectively at trial).

As for the Standard Investigative Protocol document, I find that Greenberg Traurig and TD Bank failed to conduct an adequate search of the document in response to Coquina's requests and my inquiries during trial.  The document was included in the database that Stroz processed for Greenberg Traurig.  When Stroz received the database, it placed the documents therein on a word searchable document review platform.  Thus, a *simple* word search on the document review platform should have revealed the document.  Although Evans ran word searches on her e-mail account, she did not review the e-mails she received from TD Bank employees for their attachments.  Had she done so, she would have discovered the document.  The document was also located in TD Bank's shared drive and Auletta's e-mail.  Neither Spencer nor Auletta searched the larger AML BSA shared drive before signing the affidavits Greenberg Traurig presented to this Court.  Auletta's failure to open all of the documents attached to the e-mail compounded with the Bank's refusal to even consider the validity of Coquina's request resulted in continued denial, deception, and delay.

I am also concerned about TD Bank's role in this litigation.  It appears that TD Bank's in-house counsel were conspicuously absent from any involvement in supervising or assisting in the litigation of this matter.  In-house counsel did not participate in preparing witnesses for deposition or trial.  (Evans Test., Hr'g Tr. 73-74, Jun. 12, 2012).  For example, in-house counsel only spoke to Auletta, the Bank's designated corporate representative, a few times, and the subject matter of the discussion was limited to scheduling his deposition.  (*See, e.g.*, Auletta

Test., Hr'g Tr. 14, 38-39, May 17, 2012). Although there were at least fourteen or fifteen people at TD Bank's general counsel's office involved in this matter, none of them apparently contacted Spencer, Auletta, or apparently anyone else to locate the CDD form. (*See, e.g.*, Auletta Test., Hr'g Tr. 13-14, May 18, 2012; Hr'g Tr. 18, Jun. 12, 2012). It also does not appear that in-house counsel was involved in ascertaining the existence of the Standard Investigative Protocol document or in adequately reviewing documents prior to production.

Further, TD Bank compartmentalized its groups of attorneys and segregated information from the trial attorneys in this case.[12] The Greenberg Traurig attorneys dealt with different individuals depending on the subject matter or nature of the inquiry. (Evans Test., Hr'g Tr. 71-73, Jun. 12, 2012). The principal contact person at the Bank, Leo Doyle, who is head of TD Bank's U.S. litigation department, never informed Greenberg Traurig of the nature of Sullivan & Cromwell's and the consultant's work, even though it went to the heart of this litigation. (Hr'g Tr. 18-19, 70-71, Jun. 12, 2012; Evans Test., Hr'g Tr. 61-62, Jun. 12, 2012). TD Bank took the decision of whether to provide the report to its expert, produce this document, or limit the expert's testimony based on the information obtained through the report out of Greenberg Traurig's hands by segregating the information from them.

No one outside attorney was aware of the existence of all the discoverable or relevant materials. TD Bank's general counsel's office, on the other hand, had all the information. It knew about the work the consultant was conducting and it had control over what information Garces reviewed. The report was relevant to the expert's work, and suggests, contrary to Garces' testimony, that TD Bank's systems were not reasonable. Had Greenberg Traurig attorneys been

---

[12] Although non-production of the consultant's report may not have violated any court order, I have considered evidence related to the consultant's report to determine an overall pattern of bad faith or willful conduct.

aware of this report, they may have decided not to use Garces as an expert or limit his direct examination.  I can only speculate as to the attorneys' alternative litigation strategies, of course. I do conclude, however, that TD Bank willfully concealed relevant evidence from its trial counsel.  In doing so, TD Bank prevented trial counsel on both sides from fully and accurately presenting the issues in this case, and interfered with the judicial process.

It also has become clear that some of TD Bank's witnesses were unprepared or less than candid under oath.  Auletta's testimonies were inconsistent throughout this and related litigation. At his April 7, 2011 deposition in this matter, as the Bank's Rule 30(b)(6) corporate representative, he testified that he reviewed the AML BSA policies in preparation for the deposition. (Auletta Dep. 20).   As the evidence revealed, the document titled "Standard Investigative Protocol" was in the AML BSA shared drive and consisted of a relevant Bank policy.[13]  It was also in his e-mail files at the time of his deposition.  Whether he used the document or not during the course of his daily work with the Bank is irrelevant.  He testified as the corporate representative and was therefore charged with knowledge of all of the Bank's relevant policies and procedures.   I can only conclude that, at worst, Auletta provided intentionally misleading testimony, at best, failed to properly prepare for his deposition, thereby derailing Coquina's preparation of its case.  As a result, Coquina was prejudiced by having to expend time and effort in tracking down the Standard Investigative Protocol document in the midst of trial, by being deprived of the use of this evidence at trial, and litigating this post-trial sanctions issue now.

Gillen's statement in the previously undisclosed October 31 and November 4, 2009 e-

---

[13] Auletta disingenuously tried to maintain that the Standard Investigative Tools and Standard Investigate Protocol documents were not "policies" but merely a guideline or standard.  Spencer's description of how TD Bank employees used the documents makes clear that they set forth the procedures they followed when conducting an investigation.  (*See* Spencer Test., Hr'g Tr. 165-167, May 17, 2012).

mail would likely have been admissible at trial as an admission and contradicts at least one point of Gillen's testimony at trial, where he testifies that the first time he saw the lock letters was when in-house counsel showed it to him.  (Trial Tr. 122, Nov. 15, 2011, ECF No. 122).  Had Coquina's counsel had these e-mails before trial, they could have attacked Gillen's credibility with them on cross-examination.  Coquina was therefore prejudiced by the non-disclosure.

Upon review of all of the evidence I conclude that Rule 37 sanctions against Greenberg Traurig and TD Bank are warranted.  Having determined that TD Bank's discovery violations were willful and resulted in prejudice to Coquina, I must determine what is the appropriate sanction in this case.  Coquina urges that I strike TD Bank's pleadings or its notice of appeal.

Discovery sanctions must be "just" and "specifically related" to the discovery violations. *See Ins. Corp. of Ireland, Ltd. v. Compagnie de Bauxites de* Guinee, 456 U.S. 694, 707 (1982); *Sierra Chevrolet*, 446 F.3d at 1152.  The discovery violations in this case resulted in Coquina's diminished ability to prove that TD Bank's actions were unreasonable and it had knowledge of fraud.  Although the jury found in Coquina's favor, Coquina now faces post-trial motions, which challenge the sufficiency of the evidence it put forth at trial on these issues.  I will therefore direct that the facts that TD Bank's monitoring and alert systems were unreasonable and that TD Bank had actual knowledge of Rothstein's fraud be taken as established for purposes of this action.  *See* Fed. R. Civ. P. 37(b)(2)(A)(i).  This sanction will prevent further prejudice to Coquina in an eventual appeal on that issue.

Greenberg Traurig and TD Bank shall also pay Coquina's reasonable attorney's fees and costs associated with bringing and litigating the Fourth and Fifth Motions for Sanctions and its Notice of Supplemental Evidence, and its reasonable attorney's fees and costs associated with litigation resulting from TD Bank's Notice of Withdrawal.  This sanction serves to compensate

Coquina for the added expense caused by Greenberg Traurig's and TD Bank's discovery violations and abusive conduct. See *Carlucci*, 775 F.2d at 1453. Coquina's counsel shall file a motion for fees and costs within twenty days of this Order.

### B.  Sanctions are not Warranted against Individual Attorneys

The individual Greenberg Traurig attorneys' handling of this case left much to be desired. The document review and production appears to have been conducted in an almost ad hoc manner. The attorneys failed to adequately conduct document searches in response to Coquina's counsel's requests and this Court's inquiries. The attorneys produced key documents on the eve of trial, and in the midst of trial, because of failures in their document search and production procedures. Although I recognize that the attorneys were dealing with a high volume of documents, the amount of production errors that occurred throughout these proceedings were simply incredible, especially coming from lawyers in a well regarded firm like Greenberg Traurig, which in many ways earns its reputation from being able to litigate large, complex actions.

Having reviewed the evidence, however, I do not find that sanctions, including a finding of contempt, are warranted against any of the individual attorneys. The evidence does not support a finding that any of them acted willfully or in bad faith. Although they certainly acted with negligence, I am not prepared, on this record, to enter sanctions personally against them.

### IV.  CONCLUSION

For the reasons provided, it is **ORDERED and ADJUDGED** that Plaintiff's Fourth Motion for Sanctions (ECF No. 791) and Plaintiff's Fifth Motion for Sanctions (ECF No. 845) are **GRANTED in part and DENIED in part**, consistent with this Order.

**DONE and ORDERED** in chambers, at Miami, Florida, this 3rd day of August 2012.

_Marcia G. Cooke_

MARCIA G. COOKE
United States District Judge

Copies furnished to:
*Ted E. Bandstra, U.S. Magistrate Judge*
*Counsel of record*